**574**

Clifford HIBBARD, Cecil Broughton and
A. J. Broughton, Appellants,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

June 15, 1956.

P. D. Black, Sampson B. Knuckles, Barbourville, for appellants.

Jo M. Ferguson, Atty. Gen., Earle V. Powell, Asst. Atty. Gen., for appellee.

STEWART, Judge.

Clifford Hibbard, Cecil Broughton and A. J. Broughton were charged with the crime of wilful murder and with conspiracy to commit the offense of wilful murder of Andrew Hubble. They were found guilty of voluntary manslaughter. A. J. Broughton received a sentence of five years and Cecil Broughton and Clifford Hibbard ten years each in the penitentiary. They appeal.

The grounds urged for reversal are: (1) The Commonwealth did not prove that appellants committed any crime, much less the offense of manslaughter; (2) the alleged conspiracy was not established; (3) the lower court erred in failing to instruct the jury on all the law of the case; and (4) incompetent and prejudicial testimony was admitted. Since we believe with the appellants that the evidence was not sufficient to support the verdict and judgment of manslaughter we shall confine this opinion to a discussion of ground (1) only.

On the evening of February 10, 1955, the appellants, Clifford Hibbard, Cecil Broughton and A. J. Broughton, and the decedent, Andrew Hubble, were visiting at the home of Edd Mays who resides a few miles south of Barbourville near Swan Pond Creek. They had arrived at their destination in A. J. Broughton's car which was parked in front of the Mays residence on the county road. A. J. Broughton had come to Mays' home primarily to call on Lois Mays, the daughter of Edd Mays, and the others had accompanied him because they wished to do a little drinking with Edd Mays. As the evening wore on, Cecil Broughton, Clifford Hibbard, Andrew Hubble and Edd Mays consumed a half-gallon of moonshine liquor, but it was now shown that A. J. Broughton, a youth 19 years old, took any part in the drinking or mixed much with them.

Hibbard testified he asked Hubble for a cigarette, which the latter refused to give him, whereupon he reached inside one of Hubble's pockets, took out the pack, helped himself, and then gave the pack back to Hubble. This incident took place around 9:00 p. m. while they were in the kitchen. Afterwards, Hibbard walked in the front room and sat down to one side of the fireplace where a fire was burning. Hubble followed, came over to Hibbard, stood in front of him and said: "You son-of-a-bitch". We now quote Hibbard's testimony as to what occurred next. He stated: "I jumped to my feet intending to hit him and Cecil jumped up and caught me by the arm and said 'you will have no trouble with him' and said 'you come set down by me' and I turned and went over and set down by Cecil on the couch there." A few minutes later, Hubble remarked that he intended to leave, saying: "I will be walking on and you can stop and pick me up." Hibbard replied, "All right" and, according to the latter, 15 or 20 minutes thereafter the three appellants got in A. J. Broughton's car and proceeded to their respective homes. Hibbard said they looked for Hubble as they drove along, expecting to overtake him and pick him up, but they never encountered him. The two Broughtons in their testimony substantially corroborated Hibbard's version of what happened that night.

Edd Mays and his daughter, Lois Mays, testified Hibbard and Hubble started their altercation inside the house and the two Broughtons intervened and separated them before any licks were passed and led Hubble and Hibbard out on the front porch, with Mays following. A. J. Broughton and Mays soon went back inside and, after some thirty minutes, the others re-entered the front room. It was not long after this that Hubble departed and the appellants left the Mays home in A. J. Broughton's car 15 or 20 minutes behind him. Lois Mays said Hubble returned to the porch when he had been gone a little while, and A. J. Broughton went to see what he wanted, and then Hubble disappeared for good. She also stated that she heard two shots fired some fifteen minutes after the appellants had left her home, and that she sat by the window and watched the car in which appellants were riding until it disappeared from sight in the direction of Barbourville.

Ethel Wilson and her 17-year-old son, Ernest, live between the Mays residence and Barbourville and the two houses are located about 20 yards apart. The Wilson garage is some 11 yards from the residence, toward the front and in the direction of the home of Edd Mays. There is a path leading from the Mays home, through some bushes, briars and weeds where Hubble's hat was found several days afterwards, off to one side, by the officers of the law who investigated this case. According to Ethel Wilson's testimony, and we quote, "a person leaving the Mays home coming toward Barbourville and down Swan Pond would easily take that little path that would lead down to our garage."

On the night of February 10th, around 9:00 p. m., these two persons heard their dog barking and went out on the porch to take a look. They saw a person they were unable to identify, who was "wearing a light jacket and dark trousers", flee from the garage along the path, fall on his hands and knees, crawl over a rock pile near the path, rise to his feet and run up to and behind the Mays home. Hubble was wearing dark trousers and a sweater with a front of light color on this occasion. A. J. Broughton's car had not at this time left the Mays residence. Both testified they heard a car start and pull out from in front of the Mays home after they had gone back inside. Several minutes later, the dog barked a second time, and, upon coming back out on the porch, they observed the same person run from near the garage, dart across the county road, proceed through the field towards Swan Pond Creek and head up the creek in the direction where the body of Hubble was afterwards found. The boy shot twice at this running figure.

Hubble was found dead in a frozen condition on February 13, 1955, in a field

across Swan Pond Creek, approximately 150 yards from the county road and about 500 yards from the Mays residence. Snow began falling the night of February 10th and he was covered with snow when located; there was none under the body or the jacket upon which he was partly lying. The weather had turned extremely cold by this time. The doctor who performed the autopsy found scratches on the hands and legs, a bruised place on the top of the head and a severe contusion on the left side near the temple and ear. This witness was of the opinion that Hubble's death was due to alcoholism, or to freezing to death, or to the stroke on the head, or to a combination of these factors. Passing upon the blow Hubble had received on his head as a possible cause of his death when considsidered in connection with other conditions present, this physician thought Hubble's injuries were such as *"could have caused* him to lose his consciousness or sense of judgment in protecting himself in a usual manner." The coroner testified in a similar vein.

In checking up on Hubble's death the peace officers found that weeds, briars and bushes were trampled down around the spot where Hubble's hat was located, and the Commonwealth came up with the theory that an act of violence, of conspiratorial origin, was perpetrated at this place by the appellants upon Hubble which produced his death. It was contended that he could have been fatally injured at this location, that he then could have wandered over to and across Swan Pond Creek into the field and died where his body was found, and that he could have been so weakened and so deprived of his normal senses, as a result of the blow on his head, that he was unable to use ordinary means to take care of himself.

It is apparent the evidence upon which the conviction of the appellants was based was wholly circumstantial, if not entirely conjectural, in its import. In Baird v. Commonwealth, 241 Ky. 795, 45 S.W.2d 466, 468, we placed this limitation upon the value of this type of evidence in a case such as the one before us: "A conviction may be had upon circumstantial evidence, but the circumstances shown must be so unequivocal and incriminating in character as to exclude every reasonable hypothesis of the innocence of the accused." The case of Tarkaney v. Commonwealth, 240 Ky. 790, 43 S.W.2d 34, 40, had this to say relative to the application of circumstantial evidence in criminal cases generally: "It is not sufficient, in a case of circumstantial evidence, that the circumstances proved coincide with, account for, and therefore render probable, the hypothesis of guilt." Circumstantial evidence must exclude, to a moral certainty, every other hypothesis. The same idea is expressed in this language in Mullins v. Commonwealth, 196 Ky. 687, 245 S.W. 285, 286: "The rule that a conviction in a criminal case may be had upon circumstantial evidence alone is subject to the qualification that, if the evidence be as consistent with defendant's innocence as with his guilt, it is insufficient to support the conviction."

When we evaluate the evidence here in the light of the established and well-known legal principles we have set forth, we can only conclude that various alternatives immediately present themselves to the mind as to how Hubble met his death. Under the manslaughter instruction given by the lower court the jury had to find that a severe blow on the head was the direct or indirect cause of Hubble's death. Yet the medical testimony does not eliminate the possibility that Hubble could have died from alcoholism or that he could have frozen to death. Therefore, we might easily assume from this line of proof that we have two reasonable hypotheses, other than death occasioned by violence, that could explain Hubble's demise.

It was also shown that only Hibbard, one of the appellants, had a quarrel with Hubble, with the evidence indicating the former never hit the latter, and all the eyewitnesses to this fracas say these two made up after this sudden flare-up. There is not

a shred of testimony in the record disclosing that discord at any time ever arose between the two Broughtons and the deceased. On the contrary, it was conclusively proven that they acted as peacemakers when Hibbard and Hubble started to engage in the fight. Furthermore, it was revealed that both of the Broughtons had been steadfast friends of Hubble over a period of many years. In the light of this evidence, we must deduce that the two Broughtons could not have had any possible motive to slay Hubble.

The evidence of Ethel Wilson and her son, Ernest, tends to point up the fact that the person they saw in flight was Hubble. They, as well as Lois Mays, heard the appellants leave in the car and thereafter the Wilsons saw the running figure, and this was the second time they had seen him, leave the garage, cross the road and head for the general direction of the locality where Hubble's body was later discovered. That fleeing person, one might easily think, could have been Hubble.

We conclude the evidence in this case was more consistent with appellants' innocence than with their guilt. None of the well-known reasons for upholding appellants' conviction on circumstantial evidence were fulfilled. At the most, we have nothing more than suspicion, surmise, and speculation to rely upon that the appellants were guilty of the offense with which they were charged, and we have many times held that such factors will not support a conviction in a criminal case. See Tarkaney v. Commonwealth, supra, and the many cases cited therein on this principle. It follows the lower court should have instructed the jury to find peremptorily for the appellants in accordance with their motion.

Wherefore, the judgment is reversed and the case is remanded with directions that if the evidence be materially the same at another trial, the lower court will direct the jury to find for appellants.