Sheila DAVIS, Appellant,

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 88–SC–755–MR.**

Supreme Court of Kentucky.

Sept. 6, 1990.

Nick L. Pearl, Pearl, Musselwhite, Wheatley, Smith & Gohman, P.S.C., Radcliff, for appellant.

Frederic J. Cowan, Atty. Gen., Robert W. Hensley, and Ian G. Sonego, Asst. Attys. Gen., Frankfort, for appellee.

## OPINION OF THE COURT

Appellant Sheila Davis was convicted in the Hardin Circuit Court of intentional murder. The Commonwealth sought the penalty of death, but appellant was sentenced to life in prison without benefit of probation or parole for at least twenty-five years. She appeals to this Court as a matter of right. We affirm.

On August 20, 1987, the body of appellant's husband, James W. Davis, was found in the back of his locked Ford Ranger pickup truck in a Louisville parking garage. The truck was parked backwards into a space so that the rear of the truck was visually protected. A plywood board covered the substantially decomposed body, further concealing it from view.

Suspecting foul play, the investigating police officer summoned the Commonwealth's Chief Medical Examiner, George R. Nichols, II, to the scene. Dr. Nichols was unable to make complete autopsy findings because of the condition of the corpse. Although no skull fracture or sign of brain hemorrhaging was discovered, Dr. Nichols concluded from the appearance of three wounds found on the victim's forehead that

the cause of death was a blunt force injury to the head.

From the presence of the food found in the digestive tract, Dr. Nichols opined that the victim died within 60 to 90 minutes after he ate. However, the doctor testified that he could not determine how long Mr. Davis had been dead. His blood contained an alcohol level of at least .16 at the time of his death, and he had apparently vomited shortly before dying.

At trial, appellant's testimony tracked the story she relayed to investigating officers during several interviews conducted soon after her husband's body was discovered. The victim was in the army and stationed at Fort Knox. He, appellant and their children lived nearby in Radcliff, Kentucky. Appellant stated that on Saturday, August 15, 1987, Mr. Davis ate dinner around 8:00 P.M. and then left the house sometime after 10:00 P.M. He was depressed about an upcoming transfer to South Korea.

Appellant began to inquire as to her husband's whereabouts on Sunday, August 16, 1987, when she awoke early and found that he had not returned home from the night before. After contacting friends, commanding officers and the military police, appellant reported her husband missing to the Kentucky State Police when she returned from work on Monday, August 17. She was notified on Friday, August 21, 1987, of the discovery of her husband's body.

The first of appellant's interviews with investigating officers took place on August 21, 1987, and she was interviewed again the next day at Fort Knox. On August 24 she was taken to the Louisville Police headquarters for more than three hours of questioning. She submitted to a lie detector examination on August 25 which produced inconclusive results. She was notified that she was the primary suspect in the death of her husband during a September 9, 1987, interview at the police department. Only then was she informed of her constitutional rights.

On April 7, 1988, the Jefferson County Grand Jury returned an indictment against Sheila Davis "for murder and complicity for the death of James William Davis." Venue was changed to Hardin County on April 19. Trial commenced in the Hardin Circuit Court in August of 1988.

The Commonwealth sought to prove that appellant, acting alone or in concert with her lover, Ron Stoker, murdered her husband to obtain his life insurance proceeds. Appellant and Stoker had both misrepresented their relationship to investigating officers by maintaining that their affair had ended well before the victim's death. Numerous prosecution witnesses testified to the contrary. The prosecution relied heavily on testimony concerning appellant's incriminating actions and inactions near the time of her husband's disappearance to prove her guilt.

Appellant's defense centered on the possibility that her husband had died of natural causes. She presented expert medical testimony which disputed the medical examiner's conclusions concerning the cause of Mr. Davis's death. Dr. William Godfrey, an Elizabethtown internist, testified that in his opinion, the victim did not die from blows to the head. Instead the head wounds were probably caused by a bolt on which the body lay in the bed of the truck. Dr. Godfrey was impressed by the contents of the victim's medical records, including chest pains, stomach pains, dizziness, syncope (blackouts), and possible alcoholism. Dr. Godfrey testified that alcohol consumption could have aggravated an existing heart condition and that cardiac disease could have been the cause of death. A treating physician essentially concurred. He reported the victim's complaints about chest pains during the year prior to his death. Medical records showed Mr. Davis had been admitted to the army hospital emergency room four times in the last six months of his life for this problem. Further expert testimony revealed the victim's documented and long-standing alcohol abuse. While the autopsy results could not confirm heart disease as the cause of death, neither could they refute that possibility.

Appellant also suggested that others may have been responsible for the victim's body being taken to the parking garage. There was supposition that her husband may have died while visiting a girlfriend or while in an otherwise awkward location. The evidence established that the victim engaged in extramarital relationships. In summary, appellant contends she can't be convicted of murder if no murder occurred and that the Commonwealth failed to prove this crime was committed.

On this appeal, appellant presents twelve allegations of error. We first address her challenges to the sufficiency of the evidence as they strike at the very heart of the case.

Appellant claims the Commonwealth failed to prove that the victim's death was caused by violence. Citing *Hibbard v. Commonwealth*, Ky., 291 S.W.2d 574 (1956), she argues that circumstantial evidence is insufficient to support a conviction where the proof raises a reasonable hypothesis other than death occasioned by violence to explain the death of the deceased. Reviewing the relevant evidence, she asserts that it was established that her husband's death was *not* caused by blunt force trauma to the head. She further notes the absence of a murder weapon, time of death, and the identity of a co-conspirator.

The Commonwealth relied on the conclusion drawn by the state's chief medical examiner to determine the cause of Mr. Davis's death. Although admitting that he did not have the benefit of reviewing the victim's medical records in drawing his conclusion, Dr. Nichols held firm under cross-examination on his finding of death by blunt force injury, despite being questioned on the so-called "bolt theory." The jury also had before it the testimony of two medical experts called by appellant. While they disagreed with the medical examiner's conclusion, Dr. Godfrey conceded that considering the circumstances in which he was found, the victim may have been murdered. In *Murtaugh v. Commonwealth*, Ky., 579 S.W.2d 619, 620 (1979), we said though "there was evidence which indicated that

death may not have been caused by criminal agency, the jury was entitled to weigh the conflicting evidence." The prevailing rule for determining a criminal defendant's entitlement to a directed verdict is found in *Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3 (1983).

" 'If under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal.' " *Id.* at 5 (citing *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530 (1977)). This standard applies to evidence of the *corpus delicti*, as well as to evidence of the defendant's guilt.

Upon her claim of entitlement to a directed verdict, appellant contends that the Commonwealth relied almost exclusively on her motive—to collect her husband's life insurance proceeds and to continue her relationship with her lover—to prove she committed the murder. She claims to have been tried upon highly prejudicial evidence of her bad moral character and lifestyle and not for murder. Finally, she argues she cannot be convicted on circumstantial evidence if such is as consistent with innocence as with guilt. *Collinsworth v. Commonwealth*, Ky., 476 S.W.2d 201 (1972). We agree that the evidence must do "more than point the finger of suspicion." *Matthews v. Commonwealth*, Ky., 481 S.W.2d 647, 648–49 (1972).

The Commonwealth's case was built upon circumstantial evidence. Appellant testified that the victim's truck was pulled into their garage on the night of his disappearance. It was established that this was unusual. When coupled with her testimony about a plywood board, the Commonwealth argued that these events showed an opportunity to load and conceal the body. The plywood board in question was designed to cover a well or depression in a wooden form Mr. Davis had installed in the rear of his truck for the purpose of carrying army equipment. It was in this well that his body was found. Several witnesses testified that because the plywood board rattled around in the back of the truck, the victim seldom carried it. Instead, it was

usually kept in the garage. Appellant testified that on the night her husband disappeared, she discovered the board was gone from the garage when she returned from running an errand. From the foregoing evidence, in the absence of another explanation, it was not clearly unreasonable for the jury to conclude that the victim's truck had been pulled inside the garage so that his body could be loaded and hidden by the plywood board.

Conflicting evidence was presented as to the time of death in relation to the time the victim ate his last meal. The medical examiner's testimony that the victim ate less than two hours before his death was consistent with the Commonwealth's theory that Mr. Davis was dead by the time he left the house after 10:00 P.M. as appellant testified. Appellant challenged Dr. Nichols' conclusion with her medical expert's opinion that many factors such as stress and alcohol can slow digestion. Under her theory, the victim could have died several hours later.

The prosecutor established that there was no evidence of robbery or sexual abuse of the victim to rebut a secondary defense theory that the victim may have encountered trouble while drinking at a Louisville tavern. The victim's wallet contained the four dollars appellant testified she knew he had when he left the house.

The Commonwealth established easy access to the unguarded parking garage on weekends, that appellant was familiar with the Louisville area; and established by the testimony of a fellow inmate at the Hardin County Jail that appellant was familiar with weekend access to the parking garage where the victim was found. It also pointed to appellant's knowledge of the victim's broken hand, allegedly before police officers informed her of it.

Adding weight to the circumstantial evidence against appellant, a pattern of admissions was woven through statements she made to family members and friends. The victim's brother testified that he was upset with appellant because before the body was found he felt she was not trying very hard to find her husband. Later, when appellant was visiting with her in-laws in Florida after the funeral, the victim's brother became suspicious of her reasons for wanting to return to the city where her husband had been murdered. Near the time of appellant's arrest she asked her brother-in-law to be sure her children see their grandparents in the summers, implying a knowledge that she faced imprisonment. The brother-in-law emphasized that appellant said "summers" and not "summer." Then the victim's brother asked her for a favor. He recalled telling her

"When this is all over, I don't care how it comes out, I don't care if you are convicted, or if you are left over, or whatever, but when it's all over you have got to tell me the truth because it was my brother."

To this appellant responded "Okay."

Cindy Linebaugh, a former babysitter, testified that after the victim's death appellant told her she planned to build a house for herself and her lover out of the life insurance proceeds. Appellant was shown to have knowledge of the policy prior to her husband's death. She was alleged to have made other possibly incriminating statements to Ms. Linebaugh such as "the cops thought they were so damned smart, they think they have got it all figured out except for how I lifted the body into the truck."[1] The babysitter also recalled appellant saying she thought "they" would spend only a little time in jail because it would be proven they acted in self-defense. Then "they" would get out and get the [insurance] money anyway. Linebaugh and her husband also testified that near the time of the funeral appellant was persistent about trying to remove blood stains, allegedly caused by a child's bloody nose, from her car upholstery.

The Commonwealth presented many witnesses to testify about appellant's affair with Ron Stoker. She admitted that while searching for her husband after his failure to return home, she did not call Stoker, although he was a friend of both the Davises. The implication was that Stoker al-

1. For a further discussion of this statement, see issue eight, *infra.*

ready knew what had happened to Mr. Davis. Appellant and Stoker lied to the police during the investigation about their ongoing affair. Appellant testified she was concerned about the military prosecuting her for adultery, or possibly reducing her husband's death benefits to the children because of the affair. Stoker and appellant discontinued telephone and face-to-face communication after the murder, but the babysitter testified that Stoker had previously bought and installed CB radios in his and appellant's vehicles. Stoker was staying at appellant's house at the time of her arrest.

In *Nugent v. Commonwealth*, Ky., 639 S.W.2d 761 (1982), we applied the *Sawhill/Trowel* standard of sufficiency of evidence based on circumstantial evidence. While the Commonwealth's proof in this case was not overwhelming, when the various items of evidence are added together, a mosaic appears upon which a reasonable jury could look and conclude that appellant was guilty of murder. Certainly the evidence did more than point a "finger of suspicion" based solely on motive. The trial court correctly overruled appellant's motion for directed verdict.

We now turn our attention to appellant's claims of trial error.

■ Appellant contends that the trial court erred when it allowed the Commonwealth to introduce evidence-in-chief during rebuttal and after the close of all the evidence. After the prosecution announced closed, the jury was taken, at appellant's request, to view the Davis home. During a lunch break, a former babysitter for the Davis children who had not been previously called to testify told a paralegal with the prosecutor's office that a year before the murder Sheila Davis had told her that she wanted Ron Stoker to kill her husband for his life insurance proceeds. Upon returning to the courtroom, the Commonwealth requested permission to revoke its decision not to offer rebuttal evidence. Defense counsel objected. The trial court granted the Commonwealth's motion on the condition that the defense be allowed "surrebuttal." After direct examination of this

eleventh-hour witness, the defense cross-examined her for impeachment purposes but declined to present surrebuttal evidence. The record does not disclose a defense motion for a continuance.

Rule 9.42(a) of the Rules of Criminal Procedure permits the trial court to allow evidence-in-chief during the rebuttal phase of trial "for good reason in furtherance of justice." This Court has accorded great discretion to the trial court in determining when such evidence should be received. *Pilon v. Commonwealth*, Ky., 544 S.W.2d 228, 231 (1977). There is no contention that this relevant, though damaging, testimony was deliberately withheld by the Commonwealth in order to take an undue advantage of appellant.

> "When there is no clear showing of arbitrariness or an abuse of discretion, the ruling of the trial court will not be disturbed." *Id.*

While a party should not normally be permitted to offer additional testimony after announcing the conclusion of its evidence, and certainly should be precluded from introduction of evidence-in-chief after announcing that no rebuttal evidence will be presented, we cannot overlook the probative nature of the evidence so offered and its prior unavailability. If the record demonstrated any bad faith on the part of the Commonwealth, we would not hesitate to hold that the admission of such evidence amounted to an abuse of the trial court's discretion. This not being the case, however, we find no abuse of the trial court's discretion in its application of RCr 9.42(e).

■ In her next allegation of error appellant maintains that the trial court should have granted her motion for new trial based on newly discovered evidence. Several weeks after the jury returned its verdict, defense counsel obtained, by court order, the toxicology report prepared by the Cabinet for Human Resources (CHR) Toxicology Laboratory. This report was used by the medical examiner and relied upon in the autopsy report finding of negative toxicology results. Appellant argues, however, that several tests showed positive results, which, had they been supplied to

her prior to trial, would have significantly affected both the defense and the outcome of the trial. She complains that the Commonwealth failed to comply with the pretrial discovery order and agreement by the prosecutor to supply the defense with all test results and non-results. Further she alleges an inadequate opportunity to present testimony on the newly discovered information.

It is the Commonwealth's position that the results of the toxicology report were contained, and thus provided to appellant, in the autopsy report. In ruling on the motion, the trial court considered both the arguments of counsel and the testimony of the Commonwealth's witness, Mike Ward, a forensic scientist specialist with CHR who prepared the toxicology report at issue. Mr. Ward testified concerning the substances for which he tested, the tests employed, and the significance of positive preliminary results on several medications relevant to the defense theory of the case. He stated conclusively that he detected no drugs in the blood or bile of the victim other than ethyl alcohol. He furnished his report directly to the medical examiner.

The trial court found that the Commonwealth did produce the results of the toxicology test to appellant. She has failed to explain how any evidence she may have presented on a later hearing date would have established the materiality of the individual test results in light of the forensic specialist's testimony that none of the substances for which he tested were present. As appellant's contention as to the startling and exculpatory nature of the report was not supported by the evidence, her motion for new trial was properly overruled. This claim of error is without merit.

■ Next, appellant contends that statements she made to police officers prior to being advised of her constitutional rights should have been suppressed. She asserts that the lengthy interview with two officers at the Louisville Police Department on August 24, 1987, was a "custodial interrogation" during which she was compelled to make statements in violation of her Fifth Amendment privilege against self incrimi-

nation. At no time prior to or during this three-to-four hour interview was she advised of her rights, as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), although she claims she had become the focus of the murder investigation and was deprived of her freedom of action.

Appellant does not cite nor does the record appear to contain a transcript of the suppression hearing. The trial court order overruling appellant's motion to suppress states that she was the only witness at the suppression hearing. The judge found that in the incident in question, appellant accompanied two agents of the United States Army Criminal Investigation Division from Hardin County to Jefferson County for an interview with two police officers.

"Defendant accompanied the agents freely and voluntarily. She was interviewed in a room at the police station by two police officers. The CID agents waited outside. She was never advised that she was under arrest or that she was not free to leave at any time. At the conclusion of the interview and statement, defendant was driven back to her home by the CID agents." *Order* of August 3, 1988.

Appellant does not dispute the gist of the trial court's "Findings of Fact." Instead, she disagrees with the court's conclusion that she made her statements to the police on this occasion voluntarily.

Criminal Rule 9.78 provides the procedure for conducting hearings on suppression motions, as well as the standard for appellate review of the trial court's determination.

"If ... a defendant moves to suppress ... the admission of ... a confession or other incriminating statements alleged to have been made by him to police authorities, ... the trial court shall conduct an evidentiary hearing outside the presence of the jury and at the conclusion thereof shall enter into the record findings resolving the essential issues of fact raised by the motion or objection and necessary to support the ruling. *If supported by substantial evidence the factual find-*

*ings of the trial court shall be conclusive."*

Appellant has failed to show that the ruling below was not supported by substantial evidence. "In the absence of any showing to the contrary, we assume the correctness of the ruling by the trial court." *Harper v. Commonwealth*, Ky., 694 S.W.2d 665, 668 (1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). It is the duty of a party attacking the sufficiency of evidence to produce a record of the proceeding and identify the trial court's error in its findings of fact. Failure to produce such a record precludes appellate review.

In *Harper*, the appellant committed the same oversight as has Davis, by neglecting or choosing not to avail herself of the vehicle provided in CR 75.13 to prepare a narrative statement for inclusion in the record in lieu of a mechanical or stenographic record of a suppression hearing. No reason is presented for why the record has not been supplemented. This Court will not entertain appellant's claim of error when supported only by a motion and an order.

■ Appellant also claims the trial court erred when on the fifth day of trial it excused a juror for illness without holding an on-the-record hearing. Although defense counsel objected to the dismissal, he did not request an opportunity to question the juror. Criminal Rule 9.22 requires that at the time a ruling is made, the action which the objecting party desires must be made known to the court. Appellant first requested an on record examination in her motion for new trial. This issue is not properly preserved for our review. *Blanton v. Commonwealth*, Ky., 429 S.W.2d 407, *cert. denied, sub nom. Blanton v. Ropke*, 390 U.S. 970, 88 S.Ct. 1090, 19

L.Ed.2d 1180 (1968). Moreover, the record discloses no abuse of discretion by the trial court in excusing a juror, with a doctor's recommendation in hand, for an obvious ailment.

■ Appellant next complains because she was not permitted to question a police detective about the results of the lie detector test administered to her. She claims she was unfairly prejudiced by not being able to defend herself in the eyes of the jury which had been earlier informed by a prosecution witness that appellant admitted to having taken the test. We do not believe that the Commonwealth enjoyed an unfair advantage, in that the full context of the witness' comment reveals that the remark was not specifically solicited by the prosecutor, nor does it appear particularly damaging.[2]

More importantly, this Court held in *Roberts v. Commonwealth*, Ky., 657 S.W.2d 943, 944 (1983), that "any reference to a polygraph exam is error." *See also Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 674–75, *cert. denied*, 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984). The trial court in the instant case properly sustained the Commonwealth's objection to appellant's attempt to exact further testimony about the lie detector exam. There was no objection by defense counsel to the first passing reference to the test. Appellant concedes that this was a tactical decision. We find no merit in this alleged error.

■ Appellant's next assignment of error concerns a tape recorded statement of one of the key prosecution witnesses, the Davis' former babysitter, Cindy Linebaugh. Linebaugh originally contacted the police in October 1987 as a result of a Crimestoppers presentation on television. She re-

---

**2.** "Q.35 Did you have any discussions with her as to her future plans?
 A. Yes, sir.
 Q.36 What do yu recall saying about that?
 A. The first night that we came in everybody and the girls had gone to bed, and Sheila and I went out in the front drive and had a long conversation. The conversation was the same as a lot of the other ones, to begin with. Asking what had happened, you know, what she knew

about it, what was new and different. She said they had taken her into the Louisville Police Department and questioned her *and given her a lie detector test,* and that she was no longer a suspect. We had all learned how he was hit from behind through telephone conversations. The only thing new that I heard on that was that he had a broken hand, and she told me this. That's the only thing along that that was new." TE III 391–92. (emphasis added.)

ported that although appellant had at no time told her she killed her husband, she reported a number of incriminating statements, some of which are recited, *supra*, in the discussion of the directed verdict issue.

To rebut the Linebaugh testimony, appellant attempted to introduce a tape recording of the Linebaugh deposition taken prior to the criminal proceedings in a related civil case, and a recording and transcript of an interview with Linebaugh conducted in defense counsel's office. Because no formal offer of proof was made on this evidence, the record is not entirely clear, but in her brief appellant argues the tape recorded conversations should have been admitted in order either to rebut Linebaugh's substantive testimony or to clarify it. Specifically, she points to explanations by Linebaugh which showed that some incriminating statements attributed to appellant may actually have been appellant's recitation of someone else's theory of the case.[3]

Later appellant offered the second recording for the purpose of rebutting Linebaugh's accusation from the witness stand of undue pressure or harassment by defense counsel.

The trial court overruled the second offering as an attempt to impeach the witness on a collateral issue. He declined to admit the recordings and transcripts as they were originally offered because appellant had failed to establish a proper foundation for admitting a prior inconsistent statement. Appellant filed the recordings and transcripts on avowal.

Appellant cites *Jett v. Commonwealth*, Ky., 436 S.W.2d 788 (1969) in support of her claim. In *Jett*, we said,

**3.** For example, during the interview with defense counsel, Cindy Linebaugh stated that appellant asserted her innocence to her at least five times. Next came the following exchange.
"NICK [defense counsel]: Now the part about they don't know how I got the body to Louisville.
CINDY: She did say that.
NICK: But ...
CINDY: She didn't say Louisville though.
NICK: How I got, they thing [sic] they are so
...
CINDY: How she got it in the truck were her words.

"When both the person who is said to have made the out-of-court statement and the person who says it appears as witnesses under oath · and subject to cross-examination there is simply no justification for not permitting the jury to hear, as substantive evidence, all they both have to say on the subject and to determine wherein lies the truth." *Id.* at 792.

In *Jett* we identified several limitations on the rule expanding the purpose for which prior inconsistent statements may be admitted for substantive as well as impeachment use. First, and applicable here, the prior statement must be "relevant to the merits of the case as distinguished from collateral issues." *Id.* Second, the foundation requirements of CR 43.08 must be met in order to give the witness whose testimony is to be supplemented "a proper and timely opportunity to give his version or explanation of it." *Id.*

The Commonwealth contends that because the tape recording or transcript was not provided to the witness, a proper foundation was not established. CR 43.08; *McQueen v. Commonwealth*, Ky., 721 S.W.2d 694, 701–702, *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987). Civil Rule 43.08 provides:

"Before other evidence can be offered of the witness having made at another time a different statement, he must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them; and, *if it be in writing, it must be shown to the witness, with the opportunity to explain it.*

They think they are so damned smart. The thing [sic] they have got everything figured out except how I lifted the body up into the truck, was what she said.
NICK: In as much as she told you she didn't have anything to do with it, you assume that's what she was telling you *they* told her right?
CINDY: Yes, she was angry, she was mad. She had been questioned for hours, she was upset, yes she was mad." Defendant's Exhibit (Avowal) 2 at 10–11. (emphasis added.)

The court may allow such evidence to be introduced when it is impossible to comply with this rule because of the absence at the trial or hearing of the witness sought to be contradicted, and when the court finds that the impeaching party has acted in good faith." (emphasis added.)

We agree that a proper foundation was not established. Moreover, the record shows that the witness admitted her prior statements when she was confronted upon cross-examination; thus there was no bona fide inconsistency.[4] Further, the other purpose for which the evidence was offered was clearly collateral. In conclusion, the trial court acted within its discretion in excluding the recorded statements of witness Cindy Linebaugh.

Next appellant asserts undue prejudice to her ability to assist in her own defense by the trial court's refusal to release her on her own recognizance.

■ Appellant contends that under the conditions set forth in RCr 4.10, she was clearly qualified to be released on her own recognizance. She points to the following facts: no criminal record, three children to care for, making house payments, substantial work history, prior course of conduct, proceeds of life insurance policy in the amount of $250,000 being held in escrow. In her pretrial motion for release, appellant also argued that the presumption of innocence should have had greater force and effect in view of the weak nature of the evidence against her.

The Commonwealth counters that the trial court has discretion to deny bail in a capital case under RCr 4.02. Further, RCr 4.16(1) directs that bail "shall be commensurate with the gravity of the offense charged."

It would appear that the factors recited by appellant in support of her motion were somewhat persuasive with the trial court in that the judge elected to reduce her bond to $50,000 full cash. As no transcript of the bail hearing appears in the record, we cannot conclude that the trial court abused its discretion. *See Commonwealth v. Peacock*, Ky., 701 S.W.2d 397 (1986).

■ Appellant next presents two issues arising from jury selection. First, she contends that the trial court erred in conducting individual voir dire on the issue of imposition of the death penalty. Without specifying which jurors were improperly struck for cause, appellant claims the trial court should not have allowed the prosecutor to further question jurors who expressed difficulty in imposing death after they had "passed" the *Witherspoon* test. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In chambers, the trial judge addressed each juror individually as follows:

"The reason I am asking these questions individually is because it pertains to the fact in this particular case the Grand Jury has indicted the defendant on a charge of Capital Murder, which means the prosecutor is going to seek the imposition of death penalty if the defendant is found guilty in this case. What I need to know is whether you, personally, have any conscientious, moral, or religious scruples against the imposition of the death penalty?"

He would ask further about the juror's ability to follow the law if the first answer was affirmative. Then the prosecutor and defense counsel were invited to question the juror. Occasionally one of them asked a juror whether he or she could consider

---

**4.** "Q.38 [by defense counsel]: Did I not ask this question: 'Did Sheila Davis ever tell you that she had any involvement in the death of her husband?', and your answer was, 'No, she told me she did not do it. Several times she told me that she didn't do it.'
 A. [by Linebaugh]: Sheila has always told me she did not do it.
 Q.39 You said that numerous time throughout that entire deposition?

 A. She's always told me she didn't do it.
 Q.40 And in that deposition you explained that everything that Sheila told you about how it happened was with reference to how the police said it happened, or Marty said it happened, did you not?
 A. I cannot be sure of that. You asked me months later after I had already talked. *I believe mainly, yes.*" TE V 573 (emphasis added).

the full range of penalties, including the minimum of twenty years.

The four prospective jurors whom the prosecutor moved successfully to strike for cause all stated they would either be unable or reluctant to give the death penalty under any set of facts. Juror # 129, who expressed reluctance, followed up by saying "I am against it [the death penalty]."

The current standard to be applied in such circumstances was enunciated in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The relevant question to be asked is

"whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.*, 469 U.S. at 424, 105 S.Ct. at 852.

Applying this test to the jurors in the case at bar who were excused for cause, we find no error in the trial court's ruling. The record supports the conclusion that the excused jurors' views would have substantially impaired the performance of their duties. *See Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

■■■ Appellant also maintains that the jurors should have been asked about their ability to impose the full range of penalties, minimum as well as maximum. This counterpart to death qualification of juries is implicit in the *Witt v. Wainwright* standard. In *Grooms v. Commonwealth*, Ky., 756 S.W.2d 131 (1988), we said,

"Conversely, a juror should be excused for cause if he would be unable in any case, no matter how extenuating the circumstances may be, to consider the imposition of the *minimum* penalty prescribed by law." *Id.* at 137 (emphasis added).

It would be a better practice for a trial judge conducting death penalty voir dire pursuant to RCr 9.38 to inquire about a juror's ability to consider the full range of penalties in capital cases. However, appellant was not prevented from asking this question. She cannot now complain because she consistently failed to take advantage of the opportunity to do so.

■■■ In her second claim of error regarding voir dire, appellant contends the trial court erred in restricting defense counsel's questioning. Counsel proposed to instruct the jury on Grand Jury procedure and how it reflects on the presumption of innocence. The trial court refused to allow the lesson, noting that it had already instructed the jury to afford no weight to the Grand Jury's indictment. There was no abuse of the trial court's discretion with regard to the examination of jurors.

■■■ Finally, appellant argues that the jury should not have been instructed on complicity because this allowed it to find her guilty whether it believed she acted alone or in complicity with another. As the record reveals no objection to this instruction, this issue is not preserved for our review. RCr 9.54(2).

In summary, we recognize that the evidence against appellant is not overwhelming. Much of it was sharply disputed and many questions remain unanswered. Persons accustomed to television drama in which every material fact is disclosed are necessarily uncomfortable when a murder conviction is obtained upon less than compelling evidence. Nevertheless, upon a painstaking review, this Court has concluded that sufficient evidence was presented to render the jury's verdict not unreasonable. In discharge of this Court's duty of appellate review, every error alleged by appellant has been thoroughly considered, discussed and appropriate legal principles applied. In such circumstances, the Court must remember that the determination of the facts is the function reserved to the jury and its duty is limited to reviewing questions of law. Appellant received a fair trial. The judgment of the Hardin Circuit Court is affirmed.

STEPHENS, C.J., and COMBS, GANT, LEIBSON, VANCE and WINTERSHEIMER, JJ., concur.

LAMBERT, J., dissents by separate opinion.

LAMBERT, Justice, dissenting.

I dissent from the opinion of the Court for the reason that the Commonwealth failed to prove beyond a reasonable doubt that the victim was murdered.

At trial, the doctor who testified for appellant stated that it was extremely improbable that the victim died of blunt force trauma to the head as contended by the prosecution. On behalf of the Commonwealth, however, Dr. Nichols testified on direct examination as follows:

Q.52 Were there any other findings?

A. The intracranial examination was performed. There was no identifying external or internal skull fracture associated with the three wounds of the forehead and scalp area as I described it. This, however, does not mean that substantial intracranial trauma had not occurred. The brain, at the time of the examination, consisted of a shrunken, liquified, green mass, as a result of the putrefaction that I talked about. It was confined to a membrane which covers the brain and extends down the spinal cord. The membrane is called the dura. The dura was intact, there were no skull fractures identified, and the brain was liquified. It could have well been injured substantially, it also may not have been injured. There is no way I can tell you that one way or the other. Because the evidence in this case, the brain, is no longer with substance that I can make that determination with.

Q.53 Was there any blood present in that portion of your examination of the brain?

A. No, sir. Blood, if present, would have liquified as a result of the same process that had liquified the brain.

Q..54 Anything else in your examination of the internal remains of Jim Davis?

A. No, sir.

Q.55 Did you at the conclusion of this autopsy examination of Jim Davis come to a conclusion in your professional expertise as to the cause of death?

A. Yes, I did.

Q.56 Would you tell the ladies and gentlemen what your opinion of the cause of the death of Jim Davis was?

A. In my opinion the death of Mr. Davis was the result of a blunt force injury to the head.

Q.57 Would you explain that, why you feel that is the cause of death?

A. I found no evidence of any other type of external trauma which had been applied to his body. I found no evidence of existing disease. He was not shot, strangled, stabbed, or beaten in any other area of the body. And he clearly, because of where his body was found, didn't die from natural disease and drive himself there.

From the foregoing testimony, it is clear that the victim had no skull fracture, the dura (brain sack) was intact, and the brain had liquified to such an extent that a post mortem examination of it was impossible. In fact, Dr. Nichols testified that from the condition of the brain it was impossible to determine if there was a brain hemorrhage. Moreover, he testified that he was unable to determine what type of blunt instrument caused the head injury and admitted that the injury could have been caused by the bolt in the truck bed, the defense theory. Nevertheless, Dr. Nichols opined, upon the absence of any other explanation for the victim's death, that the cause of death was blunt force trauma to the head.

The question before the Court is whether such evidence is sufficient as a matter of law to permit a jury determination of murder beyond a reasonable doubt. Disregarding the testimony from appellant's doctors, is Dr. Nichols' view, i.e. death must have been caused by head injury because he found no other injury, sufficient to make a prima facia case? In many cases such deductive reasoning would be entirely acceptable, but in this case the decomposed condition of the body and the absence of any apparent cause of death renders such an approach inherently unreliable. Dr. Nichols' opinion was without a sufficient factual predicate to permit a jury determination based thereon beyond a reasonable doubt.

In *Timmons v. Commonwealth*, Ky., 555 S.W.2d 234, 238 (1977), this Court said "What the law requires is probability which has been defined as more likely than not." In *Alexander v. Swearer*, Ky., 642 S.W.2d 896 (1983), this Court analyzed the requirements for expert opinion. We held the opinion must not be based on assumption or undisclosed facts. In *Alexander* we noted the "obvious impact on a jury, of the testimony of an unbiased, objective policeman." Finally, in *Wells v. Conley*, Ky., 384 S.W.2d 496 (1964), the use of assumption by expert witnesses was rejected.

When the portion of Dr. Nichols' testimony as quoted herein is objectively examined, it amounts to nothing more than assumption. By simple deduction, Dr. Nichols achieved a decidedly nonscientific opinion. By virtue of his status, however, the opinion expressed was accepted by the jury.