Ronald Loren STOKER, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Sheila DAVIS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Nos. 89–SC–763–MR, 89–SC–764–MR.

Supreme Court of Kentucky.

March 12, 1992.

Rehearing Denied June 4, 1992.

James A. Maples, Elizabethtown, for appellant, Ron Stoker.

Chris F. Gorman, Atty. Gen., Robert W. Hensley, Asst. Atty. Gen., Criminal Appellate Div., Frankfort, for appellee.

Julie Namkin, Asst. Public Advocate, Frankfort, for appellant, Sheila Davis.

LEIBSON, Justice.

In a joint trial:

1) Sheila Davis was convicted of three counts of first-degree sodomy (30 years each), eight counts of first-degree criminal abuse (7 years each), and two counts of first-degree sexual abuse (5 years each), all run consecutively for a total sentence of 156 years.

2) Ron Stoker, her live-in boyfriend, was convicted of three counts of first-degree rape (50 years each), three counts of first-degree sodomy (30 years each), three counts of first-degree sexual abuse (5 years each), and eight counts of first-degree criminal abuse (7 years each), all run consecutively for a total sentence of 311 years. He was also convicted of terroristic threatening for which he received an additional 12 months which runs concurrently by operation of law because it is a misdemeanor. See KRS 532.110(1)(a) and its Commentary.

The victims of the abuse were Sheila Davis' three daughters, Amber (age 7), Cathy (age 6) and Cindy (age 2), and a neighbor girl, Rebecca Koch (age 7).[1] The evidence adduced from the children at trial established that Sheila Davis and Ron Stoker tied them up, taped their mouths and made them watch pornographic movies, made the children perform oral sex on them and that Ron committed acts of rape and anal sodomy. Further physical abuse occurred when Ron administered discipline with a wire coat hanger, with Sheila's consent.

All of the children except 2–year old Cindy testified at trial. So did Ron Stoker. Sheila Davis, however, did not testify, presumably because she feared impeachment having been convicted of her husband's murder (now affirmed by our Court in Davis v. Commonwealth, Ky., 795 S.W.2d 942 (1990)). Her conviction, which was on appeal to our Court at the time of this trial,

---

1. It is necessary to use names rather than initials because two of the children share the same initials.

is involved in some of the issues in the case at bar.

Sheila Davis has filed a Brief raising ten issues, six of which will be discussed in this Opinion. The remainder are not preserved by contemporaneous objection and do not merit consideration under the rule that applies where there is "manifest injustice." RCr 10.26. Ron Stoker has filed a Brief raising eight issues.

Both appellants claim trial error in allowing the jury to hear testimony suggesting that Sheila Davis had been charged and convicted of murdering her husband and that Ronald Stoker was involved in this killing. As stated in *Davis v. Commonwealth,* cited *supra,* the disappearance and death of appellant's husband, James W. Davis, occurred in August, 1987. Sheila Davis was indicted for this crime on April 7, 1988, and since that date her three children, Amber, Cathy and Cindy Davis, have been in the care of their aunt, Ginger Davis, who is married to James W. Davis' brother. Shortly after the death of James Davis, Ronald Stoker, who was involved in an intimate relationship with Sheila Davis, moved into the Davis household and assumed a parental role, and remained in this position until Sheila Davis' indictment in April 1988. The events related in the multiple charges against these appellants occurred during this period. The conviction of Sheila Davis for intentional murder of her husband, affirmed in *Davis v. Commonwealth, supra,* by Opinion rendered September 6, 1990, was on appeal at the time the present charges were tried.

■ Specifically, the trial testimony about which the appellants complain unfolded in the following manner. First Cathy Davis testified, without objection, while describing circumstances surrounding the commission of the acts charged, that appellants stated it was right to be doing what they were doing and "they said if we didn't do it they would kill us like *they did our dad."* (Emphasis original.) Next, about an hour and a half later, after Cathy had finished her testimony and her sister, Amber, was on the witness stand, Amber testified that while touching Stoker's penis with her mouth he would say "not to tell anybody or else he'd kill us like he did our dad." At this point Stoker's attorney objected, and at a bench conference both appellants moved for a mistrial. Davis objected that any evidence implying her responsibility in the death of her previous husband was inadmissible except for impeachment if she decided to testify, and Stoker complained even more vehemently stating that as to him this was simply evidence of a previous uncharged criminal act of a highly prejudicial nature. The trial court decided that such evidence was admissible not as proof such a crime had been committed, but solely as proof "such statement was made to her," in circumstances where the making of the statement was itself a relevant circumstance. The black letter rule, as stated in Lawson's treatise on Kentucky evidence, *The Kentucky Law Evidence Handbook,* 2d ed., Sec. 8.00(B) (1984), is:

> "(B) Nonhearsay Use of Extrajudicial Statements: If an out-of-court statement is offered into evidence for the sole purpose of proving that it was uttered, and if the mere utterance of that statement is relevant to the issues, the testimony of a witness who heard or made the statement is admissible."

The statements of Cathy, not objected to, and of Amber, which precipitated objection and motions for a mistrial, fall within the rule relating to nonhearsay use of extrajudicial statements, stated above. The trial court did not err in finding such evidence relevant, nor was his ruling an abuse of discretion under the further rule that evidence only "remotely relevant" should be excluded when "the probative value of the evidence" is significantly outweighed by "its inflammatory nature." *Commonwealth v. Morrison,* Ky., 661 S.W.2d 471, 473 (1983).

> "When the utterance of certain words constitutes or is part of the details of an act, occurrence or transaction which in itself is relevant and provable, the utterance may be proved as a verbal act...." *Preston v. Commonwealth,* Ky., 406 S.W.2d 398, 401 (1966).

Most certainly, considering the prejudicial nature of such testimony, these appellants would have been entitled to an admonition to the jury instructing the jurors that such evidence should be considered, if they believed it, only as proof that it was said, and not as proof that the crime occurred. The record reflects that the appellants decided against requesting such an admonition, making a conscious decision to instead attack the evidence through the sworn testimony of the appellant, Ronald Stoker, who, when he testified, denied both the making of any such statements and any involvement in the death of James W. Davis. Thus the failure of the trial court to admonish the jury regarding the limited use that could be made of the evidence from the children regarding these statements is not an issue in this case.

■ Next, we address Stoker's claim of error regarding the prosecutor's cross-examination after he had testified denying responsibility in the death of Jim Davis.

First, we take note of the opening statement by Stoker's counsel, made shortly before he testified, that Stoker's "testimony will show there has been a legal accusation ... only that Sheila murdered Jim Davis. There is not even an accusation of that sort about my client." Then, on Stoker's direct examination he stated there was "a proceeding going on regarding Sheila," and that "her case is being appealed to the Supreme Court." To this point there had been no objections from Sheila Davis' counsel. This direct examination opened the door to a limited and responsive cross-examination.

It was only when the Commonwealth's counsel undertook to preface a question by saying "the truth is he [Jim Davis] was bludgeoned to death," that objection was first made by Sheila's counsel, and the prosecutor promptly withdrew the question. The jury could have been admonished not to consider this comment, but there was no request for an admonition.

Next, the following colloquy took place: "Com: He was murdered, wasn't he?
Stoker: I don't know what he was.

Com: Found in a truck up in Louisville, wasn't he?
Stoker: Correct.
Com: And your attorney brought this out. Sheila, you said, was charged.
Pearl [Sheila Davis' attorney]: Let me object and approach the bench."

So much of the cross-examination as stated above was relevant and responsive to what had already been brought out in Stoker's direct examination. The trial court did not err in overruling the objection, nor subsequent objections to further cross-examination which added little, if anything, to what had already been disclosed. Nor do we think the limited nature of the prosecutor's comments in closing arguments addressing this subject constituted prejudicial error.

■ Finally, we address Sheila's position that, by electing *not* to testify, she should have been insulated from proof that she had been convicted of the murder of her husband. We agree with her that in a separate trial this evidence would not have been admissible if Sheila did not testify. But, the only claim of error in the *Davis* appeal addressed by these circumstances is her complaint that the judge should have "sua sponte" separated her "trial from that of her co-defendant after her co-defendant's counsel brought out that appellant had been tried and convicted of murdering her husband and her conviction was on appeal." Davis' counsel made no motion, pretrial or during trial, for a separate trial, and it was not incumbent, indeed not even proper, for the trial court to make one for her. This evidence from Ronald Stoker, which was admissible in the presentation of her co-defendant's case, presents no reviewable claim of error on her behalf.

■ We turn next to the Motion for Change of Venue, supported by affidavits, made pretrial on behalf of Ronald Stoker (not Sheila Davis). Our recent decision in *Whitler v. Commonwealth*, Ky., 810 S.W.2d 505 (1991), is controlling. *Whitler*, holds, overruling prior authority to the contrary, that the trial court had not abused its discretion in overruling a motion for change of venue, even though the Com-

monwealth had failed to file counter affidavits or produce witnesses to oppose the motion. Here the motion was overruled after a hearing at which the principal argument was that the publicity surrounding the Sheila Davis murder trial would prevent Ronald Stoker from receiving a fair trial. The trial court was of the opinion that Ronald Stoker would not be prejudiced by publicity surrounding trial of a co-defendant for murder, and we find nothing in the circumstances compelling a contrary result.

Next, we take up various claims from one or both appellants charging insufficient evidence to support convictions on some of the offenses charged.

■ The most significant of these claims, weighed in terms of the gravity of the offense and the seriousness of the punishment, is Stoker's complaint that "the rape and sodomy convictions were totally unsupported by sufficient evidence because the Commonwealth's evidence indicated that no [such] abuse regarding the Davis children occurred." This complaint originates in the fact that only one of three Davis children, Amber Davis, was examined by a doctor, and she showed no signs of rape or sodomy (or, for that matter, any other physical abuse).

The last acts of abuse are alleged to have occurred before April 7, 1988, the date when Sheila Davis was indicted for her husband's murder and the children's aunt assumed their custody. Amber was examined four months later, in August 1988, when the children were back in town for their mother's trial and the possibility of sexual abuse was first reported. The doctor's report, which was offered in evidence by the defense, reported no evidence of tearing, scarring, or other physical changes consistent with abuse. The remaining two Davis children were not examined. However, a different physician examined the neighbor child, Rebecca Koch, and this physician testified at trial that his examination of Rebecca revealed physical signs in the vaginal area consistent with sexual abuse, although nothing around the anus corroborating sodomy for which Stoker was convicted.

The statutory definition of "sexual intercourse" extends to "any penetration, however slight; emission is not required." KRS 510.010(8). The children's testimony was consistent with contact and "slight" penetration, and the physical evidence was not such as to compel a finding to the contrary. In *Robinson v. Commonwealth*, Ky., 459 S.W.2d 147, 150 (1970), we stated:

> "So far as the question of the sufficiency of the evidence offered here to sustain the conviction ["for rape"] is concerned, we point to the fact that Kentucky follows the common law rule that the unsupported testimony of the prosecutrix, if not contradictory or incredible, or inherently improbable, may be sufficient to sustain a conviction...."

In this case the same physician who examined Rebecca Koch and testified for the Commonwealth that there were physical findings in her case, when called in rebuttal after the defense presented in evidence the negative report made by the physician who examined Amber Davis, testified that lack of physical findings was not conclusive. In these circumstances we are in no position to declare the lack of physical findings so "contradictory or incredible, or inherently probable" (*Robinson, supra*) as to compel a finding that the evidence regarding rape and anal sodomy was legally insufficient. And, of course, the lack of physical findings has no bearing on the charges of oral sodomy against these appellants.

Both appellants were convicted of four counts of Criminal Abuse I, one as to each child, for hitting the children with a wire coat hanger, and four more counts of Criminal Abuse I for tying the children up and putting tape over their mouths and forcing them to watch pornographic movies, again one as to each child. Each count of criminal abuse was punished by a sentence of seven years confinement.

The Criminal Abuse statute, enacted in 1982, is one of the many statutes creating crimes subsequent to the unified and coordinated 1974 Kentucky Penal Code, lacking the clarity and precision of the Code. Nevertheless in *Carpenter v. Common-*

*wealth*, Ky., 771 S.W.2d 822 (1989), and in *Cutrer v. Commonwealth*, Ky.App., 697 S.W.2d 156 (1985), this Court and the Court of Appeals rejected challenges that the terminology within the Criminal Abuse statutes should be declared unconstitutionally void for vagueness, upholding convictions in cases with problems similar to those in the present case.

■■■ We have no difficulty in holding the bizarre misconduct involved in those charges of Criminal Abuse I generated by tying up the children, putting tape over their mouths, and forcing them to watch pornographic movies, can reasonably and appropriately be deemed by a jury to constitute "torture, cruel confinement or cruel punishment ... to a person twelve (12) years of age or less." KRS 508.100(1)(c). The question whether "hitting [a child] with a wire coat hanger" is sufficient to prove Criminal Abuse I is more difficult, particularly where, as here, the blows inflicted did not result in medical treatment or leave scars or marks to verify that severe beating had occurred. It may well be there are situations where using a wire coat hanger to correct a child's behavior, if not appropriate, is at least within the legal limits of parental discretion in raising their children.[2] *See* KRS 503.110 on the "use of force by [a] person with responsibility for care, discipline or safety of others."

Nevertheless, we conclude the beatings administered here were sufficient to sustain the charges because the children testified to circumstances proving the nature of the beatings to have been cruel and indiscriminate, and far different in character from normal parental discipline. The evidence was such that the jury could believe the beatings qualified as "torture ... or cruel punishment ... to a person [under] twelve (12) years of age." KRS 508.100(1)(c), *supra.*

The appellants neither asked for nor complained of the lack of an instruction qualifying the use of force under KRS 503.110(1), *supra,* and certainly there was no reason why the judge should have given any such instruction *sua sponte.* The lack of such an instruction is not an issue involved in the particular circumstances of this case.

We have recently restated the controlling principle for granting a directed verdict, in *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991), as follows:

"On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony."

Applying this standard, we find no error in the trial court's decision to overrule the appellants' motions for directed verdict as to the Criminal Abuse I counts in this case.

■■■ The appellants claim trial error in failing to excuse for cause a juror who revealed on questioning that her best friend's granddaughter had been abused and killed 14 years previously, a situation about which she had strong feelings. Another judge may have excused this juror for cause based on her answers, but the question is whether in failing to excuse this juror the trial court abused its discretion. The juror's answers, when viewed in their entirety, suggest the juror was being conscientious, not showing bias. Ultimately, the juror assured those present that she could listen to the evidence and render a

---

**2.** For an interesting commentary on using a wire coat hanger to administer parental discipline, see *Time* Magazine, *Ted Turner, "Man of the Year"*, January 6, 1992, p. 36: "To understand why Turner and the father he worshipped had no ordinary filial competition, consider this: "When young Turner did something bad, his father Ed beat him with a wire coat hanger. When young Turner did something very bad, Ed once ordered his son to beat him. 'He laid down on the bed and gave me the razor strap and he said, 'Hit me harder,' ' Turner told interviewer David Frost. 'And that hurt me more than getting the beating myself.' "

fair and impartial verdict. We have recently recognized that the decision regarding juror "[i]mpartiality is not a technical conception ... limited to the juror's response to a 'magic question,' " *Montgomery, Sherman and Hudson v. Commonwealth*, Ky., 819 S.W.2d 713 (1991). But here, when reviewed "in the totality of circumstances," the juror's responses were not such as to require disqualification. They do not compel the conclusion that the trial court abused its discretion.

■ Appellant Davis also complains about a second juror who failed to reveal an association with the County Sheriff in answer to a question asking whether any of the jurors had friends or family who "in any way worked for the police department," and also a question to the jurors asking if they knew anyone who worked for the Kentucky State Police. Neither question was so precisely targeted as to compel the conclusion the juror was in bad faith in failing to speak out. The casual nature of the relationship between this juror and the Sheriff was such that when the subject was first brought to the attention of the court, the trial judge overruled this complaint, and his decision falls far short of an abuse of discretion.

■ Appellant Stoker further complains that the Commonwealth breached its duty to provide exculpatory evidence because, although it produced the medical report regarding Amber Davis (negative as to physical findings), there were no further medical examinations conducted on the two remaining Davis children. Basically, this is an argument that the Commonwealth was compelled by law to have all three Davis children examined by a physician. Apparently the Commonwealth simply elected to take its chances on whether the failure to have such examinations might cause the jury to doubt the children's testimony. We agree with the appellant that there is a "long line of cases ... beginning with the case of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) expounding the defendant's 'right to receive exculpatory evidence,' " but to our knowledge *none* of the U.S. Supreme Court cases goes

so far as to suggest the prosecuting authority must take affirmative steps to generate evidence on behalf of the defense. The premise is both unreasonable and unworkable. The appellants made no effort to obtain a physical examination of the remaining Davis children, and the Commonwealth was not compelled to do so for them before continuing the prosecution of this case.

Having found no legal reason to set aside the findings of guilt as to either of the defendants on any of the numerous charges, we turn next to the penalty phase of the trial.

■ Here the appellants complain the trial court's instructions to the jury regarding concurrent or consecutive sentencing were misleading, and reversible error. Their complaints are justified. Specifically, in each case the instruction stated:

"You will further recommend in your verdict whether the punishments which you have fixed for the Defendant should run concurrently (at the same time) or consecutively (one to begin after the completion of the other)."

The form of verdict in each case stated: "We, the jury, recommend that the punishments fixed for the Defendant shall run _____." concurrently or consecutively

The appellants object on grounds these instructions tell the jury the sentences on the 17 counts of which Ron Stoker stands convicted, and the 13 counts of which Sheila Davis stands convicted, should be run all concurrently or run all consecutively, whereas the only reasonable interpretation of the sentencing statutes is to the contrary. The question is, where there are more than two convictions, do the statutes permit some to be run concurrently and some consecutively, or is it an all or nothing proposition?

■ The problem is generated by the language used in KRS 532.055(2). The statute, which is part of the Truth-in-Sentencing package enacted in 1986, specifies in part that "[t]he jury shall recommend whether the sentences shall be served con-

currently or consecutively." The pretext for enacting this section of the Truth-in-Sentencing package was to supply more information for jurors to use in setting sentences, not to enhance the severity of the sentences rendered. Nor does its existence destroy the rule of lenity that applies in interpreting criminal statutes. *Boulder v. Commonwealth*, Ky., 610 S.W.2d 615 (1980). Nor does it overrule expressly or by implication the principles controlling concurrent and consecutive sentencing expounded in KRS 532.110 and its Commentary. These principles include that "consecutive sentences should not be permitted to accumulate endlessly," and that concurrent sentencing is appropriate where the sentencing authority "does not feel strongly" to the contrary.

Applying these principles, the only reasonable interpretation of these statutes is that, where there are more than two offenses, some may be run concurrently and some consecutively, and the jury should be advised accordingly.

The Commonwealth's arguments to the contrary strike us as rather anemic: (1) "that it is not entirely clear that KRS 532.-055(2) provides for any other sentence here other than" all one way or all the other; and (2) that "the complained of instruction ... appears in perfect compliance with COOPER'S PALMORE KENTUCKY INSTRUCTIONS TO JURIES (1990), Sentencing, Sec. 11.18."

The first of the Commonwealth's arguments concedes rather than refutes an ambiguity leading to the conclusion that the rule of lenity applies. The second of these arguments seems to be there is some magic in parroting examples in an unofficial form book supplied by Anderson Publishing Co. Indeed, when one looks closely at the instruction as it appears in the form book, it is quite obvious that the language of the example was framed for a situation where sentences for only two offenses are involved, so quite obviously these two must run either concurrently or consecutively. This was not an instruction to be followed mindlessly where more than two sentences are imposed. When there was no recom-

mendation from the jury regarding this matter, and the judge had the unqualified decision to make, as was the case before Truth-in-Sentencing, judges routinely proceeded on the premise that KRS 503.110 permitted some sentences to be run one way and some the other, with no voice raised to the contrary. Surely the situation should be no different simply because the jury is now called upon to participate in the decision.

 Thus, having decided the instruction and form of verdict as submitted were erroneous, the question then becomes what relief is appropriate. The principles that applied under KRS 503.110 when a judge was deciding without a jury recommendation whether sentences should be run concurrently or consecutively still apply. Further, if the sentences are run concurrently the result will still be severe, 50 years for Ronald Stoker (which he received on each rape charge) and 30 years for Sheila Davis (which she received on each sodomy charge), with minimum parole eligibility under the violent offender statute, KRS 439.-3401, of 50% of the sentence imposed, 25 years and 15 years, respectively.

We recognize that technically it was the trial court, not the jury, that imposed consecutive sentences on all counts. But we also recognize that this was done in conformity with the jury's verdict and the practical difficulty in doing otherwise in the face of the jury's recommendation, given the highly inflammatory circumstances generated by a combination of factors including the inflammatory nature of the offenses and the murder conviction in the background. This was no ordinary case. These same circumstances also make it patently unreasonable to burden the trial court with the responsibility to decide once again which sentences should run consecutively and which concurrently, and to do so fairly with the full weight of the knowledge of the jury's recommendation sitting on his shoulders.

The only other course available in present circumstances would be to set aside the sentencing phase of the trial entirely and to remand for a complete new

**628**

trial of the sentencing phase. This is both an inadequate solution and a waste of judicial resources, and we decline this course of action.

In the situation presented, the only appropriate way to correct the sentencing error generating from the erroneous instructions for guidance is to look to the language of KRS 532.110(2), which provides:

> "If the court does not specify the manner in which a sentence imposed by it is to run, the sentence shall run concurrently with any other sentence which the defendant must serve."

Therefore, the judgment of the trial court regarding findings of guilt, and the sentences imposed for each offense, is affirmed, but so much of the judgment as orders the sentences to be run consecutively is set aside, and the within case is remanded to the trial court to enter new judgments in both cases in conformity with this Opinion, ordering all sentences for the appellants to be run concurrently in each case.

COMBS, LAMBERT, LEIBSON and REYNOLDS, JJ., concur.

SPAIN, J., dissents by separate opinion in which STEPHENS, C.J. and WINTERSHEIMER, J., join.

SPAIN, Justice, dissenting in part.

Respectfully, I dissent from so much of the majority opinion as vacates the consecutive sentences and remands the cases for resentencing. I concur wholeheartedly with affirming the convictions of both defendants and with affirming the sentences fixed for each offense. I also agree that the trial judge erred in not instructing the jury that it could recommend consecutive or concurrent sentencing as to each charge with every other charge. However, I contend that his failure to do so is not reversible error inasmuch as any such recommendation by the jury is not binding on the trial judge in any event. Even if the jury had been given the opportunity to, and had recommended that all the sentences of each defendant should run concurrently, the tri-

al judge was completely free to disregard the recommendations and order all sentences to run consecutively, as he did here. This being true, how does the failure to give the jury the opportunity to make a recommendation become reversible error?

It also strikes me as extremely ironic that the majority sets aside the trial judge's sentences because the jury *might* have recommended some concurrent sentencing when here we know beyond any doubt that the jury recommended that, at the very least, two sentences would run consecutively as to each defendant. If this had not been so, they obviously would not have checked the "consecutively" block on the verdict forms. Moreover, we also know beyond *any* doubt that the jury did *not* recommend that all sentences would run concurrently for each defendant, since they did *not* check the "concurrently" block available on the form. Nonetheless, this is precisely the sentence which the majority ends up imposing on each defendant. Are we really trying to discern the jury's true intention? Is this actually "truth in sentencing"?

STEPHENS, C.J., and WINTERSHEIMER, J., join in this dissent.