Kenneth CAPSHAW, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2006–CA–001918–MR.

Court of Appeals of Kentucky.

Oct. 5, 2007.

Discretionary Review Denied by Supreme Court June 11, 2008.

Kristi R. Carver, David L. Williams, Kristi Castillo, Burkesville, KY, for appellant.

Ken W. Riggs, Frankfort, KY, for appellee.

Before HOWARD and MOORE, Judges; GUIDUGLI,[1] Senior Judge.

## OPINION

MOORE, Judge.

Kenneth Capshaw appeals the Monroe Circuit Court's judgment convicting him of five counts of second degree rape and five counts of second degree sodomy. Following a jury trial, Capshaw was sentenced to serve a total of fifteen years of imprisonment. After a careful review of the record, we affirm the Monroe Circuit Court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

According to T.T., the victim, she was twelve years old when she and Capshaw, who was thirty-eight years old, began a sexual relationship. T.T. testified at trial that, on five separate occasions, she went to Capshaw's house, performed oral sex on Capshaw, and they then engaged in vaginal intercourse before she returned home.

After T.T. returned home from their fifth sexual encounter, she removed her panties, which had "blood stains[2] and stuff on them," and placed the panties in her dresser drawer. She did so because she did not want her mother to see them, and T.T. planned to wash them later.

Two days later, T.T. went to Capshaw's house, but he did not answer the door. She asked a couple of neighbors if they knew whether Capshaw was home, but neither of them knew for certain. T.T. looked in one of Capshaw's windows to try to determine whether he was home. A police officer saw T.T. in the neighborhood and told her that she needed to go home because he had received complaints from neighbors. She went home and later, a police officer came to her house, awoke her mother, and told her that T.T. had been at Capshaw's house earlier. The police officer asked T.T. why she had been at Capshaw's house looking in the windows, and he told her that she needed to tell him the truth. T.T. informed him of her sexual relationship with Capshaw, and the officer told her that he would have to report it. He then left to speak with Capshaw.

T.T.'s mother took her to the hospital, but because two days had passed and T.T. had showered since her last sexual encounter with Capshaw, the hospital could not perform a sexual abuse examination on her.

T.T.'s mother subsequently asked her if she had any clothes from any of her sexual encounters with Capshaw, and T.T. told her that she had a pair of panties. T.T. gave her mother the panties from her last sexual encounter with Capshaw, and T.T.'s mother called the Kentucky State Police Post. She spoke with Detective Russell Decker about T.T.'s allegations against Capshaw. T.T.'s mother turned over the panties to him.

---

1. Senior Judge Daniel T. Guidugli sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

2. T.T. testified that she believed there were blood stains in her panties because she was menstruating at that time.

The state police determined that the panties contained blood and semen, and a DNA analysis was performed. The odds of the semen in the panties not belonging to Capshaw were one in four hundred fifty-five trillion (455,000,000,000,000). Additionally, DNA from T.T. was found on the panties, as would be expected.

During trial, Capshaw was asked how his semen got on T.T.'s panties. Specifically, the Commonwealth asked Capshaw if it was Capshaw's "position ... that any DNA that was on, any semen of [Capshaw's] that was on that pair of panties, had to have been stolen from [Capshaw's] house?" Capshaw responded "if it's on there, yes." Capshaw contended that his semen got on T.T.'s panties because someone stole a used condom from his house and put the semen on her panties.

Detective Decker testified that he had asked Capshaw at one time during the investigation to remove Capshaw's clothes so that Detective Decker could determine whether Capshaw had any identifying marks on his body, and the detective saw a brown mole on Capshaw's body in his pubic hair area. The detective later asked T.T. if Capshaw had any identifying marks and, according to the detective, T.T. told him that Capshaw had a mole in his pubic area. At trial, however, T.T. testified that she had seen a mole in Capshaw's "pelvic" area on the right side.

During trial, Detective Decker testified that when he asked Capshaw how T.T. would have known that he had the mole in his pubic area, Capshaw stated that T.T. must have looked in his window. Capshaw also speculated that T.T. could have seen the mole while he was mowing his lawn without wearing a shirt. During trial, Capshaw was asked to show the jury his mole, which he did. Upon review of the trial tape, it appears that the mole was located on Capshaw's lower abdomen, near his belt line, rather than in his pubic region. Thus, contrary to the Commonwealth's and the Detective's assertions, the mole was in Capshaw's lower abdominal, or pelvic region, as T.T. testified at trial, rather than his pubic region. Other relevant facts will be discussed as necessary, *infra.*

Capshaw moved for a directed verdict at the close of the Commonwealth's case and at the close of Capshaw's argument. The circuit court denied both motions.

The jury convicted Capshaw on all ten counts. He was sentenced to serve ten years on each of the five second degree rape convictions, as well as five years on each of the five second degree sodomy convictions. However, his sentence for one of his rape convictions was ordered to be served consecutively to his sentence for one of his sodomy convictions, with all other counts to be served concurrently, for a total of fifteen years of imprisonment.

Capshaw moved for a new trial or, alternatively, for a judgment notwithstanding the verdict based on his conviction on all ten counts. He argued that the circuit court erred when it granted the Commonwealth's motion *in limine;* that the Commonwealth's attorney engaged in various types of misconduct; that there was insufficient evidence to convict him on counts one through eight, and that the evidence used to prove counts nine and ten was not credible; and that he was denied a fair trial based on the cumulative effect of the aforementioned errors. The circuit court denied Capshaw's motion for a new trial and his motion for a judgment notwithstanding the verdict.

Capshaw now appeals, raising the following claims: (A) the circuit court erred by not admitting testimonial evidence regarding the victim's past accusations of rape in violation of the Confrontation

Clause; (B) the separation of witnesses rule was violated; (C) the Commonwealth's attorney engaged in misconduct by comments made in his closing arguments; and (D) there was an insufficiency of evidence to support his conviction.

## II. STANDARD OF REVIEW

The circuit court denied Capshaw's motion for a judgment notwithstanding the verdict, as well as his alternative motion for a new trial. On appeal, we use the same standard of review for the denial of a judgment notwithstanding the verdict as we do for the denial of a directed verdict. *See Radioshack Corp. v. ComSmart, Inc.,* 222 S.W.3d 256, 261 (Ky.App.2007). "[T]he test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

Further, we review the denial of a motion for a new trial for an abuse of discretion. *See Fister v. Commonwealth,* 133 S.W.3d 480, 487 (Ky.App.2003).

## III. ANALYSIS

■ We first note that the Commonwealth argues on appeal that Capshaw failed to include a statement at the beginning of each of his arguments showing "whether the issue was properly preserved for review, and if so, in what manner," as is required under Kentucky Rule of Civil Procedure (CR) 76.12(4)(c)(v). It appears that the Commonwealth is correct that Capshaw failed to include such a statement at the beginning of each argument. However, "dismissal based upon a failure to comply with CR 76.12 is not automatic." *Baker v. Campbell County Bd. of Educ.,* 180 S.W.3d 479, 482 (Ky.App.2005). Because we nevertheless find that Capshaw's claims fail on their merits, we decline to dismiss this appeal under CR 76.12.

## A. CLAIM CONCERNING THE VICTIM'S PRIOR ACCUSATIONS

■ Capshaw contends that his convictions should be overturned and he should receive a new trial because the circuit court erred by excluding, under Kentucky Rule of Evidence (KRE) 412, i.e., the "Rape Shield" law,[3] the testimony of two

3. KRE 412 provides as follows:
(a) Evidence generally inadmissible. The following evidence is not admissible in any civil or criminal proceeding involving alleged sexual misconduct except as provided in subdivisions (b) and (c):
(1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.
Evidence offered to prove any alleged victim's sexual predisposition.
(b) Exceptions:
(1) In a criminal case, the following evidence is admissible, if otherwise admissible under these rules:
(A) evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury, or other physical evidence;
(B) evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent or by the prosecution; and
(C) any other evidence directly pertaining to the offense charged.
(2) In a civil case, evidence offered to prove the sexual behavior or sexual predisposition of any alleged victim is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. Evidence of an alleged victim's reputation is admissible only if it has been placed in controversy by the alleged victim.
(c) Procedure to determine admissibility.
(1) A party intending to offer evidence under subdivision (b) must:
(A) file a written motion at least fourteen (14) days before trial specifically describing the evidence and stating the purpose for which it is offered unless the court, for

men against whom T.T. had previously made accusations of sexual misconduct. Prior to trial, the Commonwealth filed a motion *in limine* to exclude the testimony at trial of the two men. One of those men was A.C.[4] and the other was E.H., a Monroe County Deputy Sheriff. During the trial, when Capshaw's counsel sought to introduce this evidence, the circuit court held an *in camera* hearing, in which A.C. and E.H. testified, as well as Detective Decker, who had investigated the allegations against E.H.

During the hearing, Detective Decker testified that T.T.'s mother had called the Kentucky State Police Post to report T.T.'s allegations that E.H. had sexual contact with T.T. "twice on one occasion." During the investigation, Detective Decker testified that T.T. made several inconsistent statements regarding her allegations against E.H. Detective Decker also attested that he told T.T.'s mother that T.T. should not have any further contact with E.H. because he did not want his investigation jeopardized.

Despite Detective Decker's admonition to T.T. to not contact E.H., E.H. gave the detective a tape recording of a telephone conversation E.H. made when T.T. called him. Detective Decker surmised after listening to the tape recording that the conversation occurred after he interviewed T.T. In the tape recording, T.T. told E.H. "you are going to have to take a polygraph test" and "you're going to get in trouble." The detective later had a conversation with T.T., in which he asked her if she had had any further contact with E.H. since he

interviewed her, and she responded "no sir." He then played the tape recording for her and he realized that "she had lied to [him] again."

Detective Decker also testified that he was troubled by E.H.'s lack of an explanation for telephone records that showed that T.T. and E.H. had a forty-three minute telephone conversation after the alleged sexual contact had taken place. E.H. could not recall what he and T.T. had discussed during this conversation. He attempted to explain it away by saying that he probably just put down the telephone for forty-three minutes while T.T. spoke. The case against E.H. was presented to a grand jury, and the grand jury did not indict him.

Detective Decker testified that shortly after T.T. made the allegations against E.H., she informed police of her present allegations against Capshaw. At the end of his testimony at the *in camera* hearing, Detective Decker stated that he had no proof that T.T.'s prior accusations were true or that they were false. When asked specifically by the court about the truth or falsity of T.T.'s allegations, Detective Decker noted that while there were inconsistencies in T.T.'s versions of the events, he could not state that her allegations were true or false.

A.C. was called next as a witness. He was advised of his rights and sworn in for the *in camera* hearing. He testified that he knew who T.T. was and that he met T.T. when she was with another girl while he was taking a friend home. On that day,

good cause requires a different time for filing or permits filing during trial; and (B) serve the motion on all parties and notify the alleged victim or, when appropriate, the alleged victim's guardian or representative.

(2) Before admitting evidence under this rule the court must conduct a hearing in

camera and afford the victim and parties a right to attend and be heard. The motion, related papers, and the record of the hearing must be sealed and remain under seal unless the court orders otherwise.

4. We are using the initials of the two men previously accused by T.T.

T.T. asked if she and her friend could ride home in A.C.'s vehicle, but A.C. declined her request. Several days later, he received a telephone call from T.T., and she asked him if he remembered her. From that point forward, he alleged that she continued to call him repeatedly. She kept asking him if he would go out with her. A.C. testified that T.T. told him she could get him in trouble. He believed that she had implied that this meant that she would allege that he had sexual relations with her. A.C. testified that he never had a sexual relationship with T.T., and the only time he saw her was when they briefly met when she asked for a ride in his vehicle. A.C. had his telephone number changed because T.T. called him so frequently. A.C. was not investigated nor charged with having sexual contact with T.T.

Deputy E.H. testified last at the hearing. E.H. attested that he knew who T.T. was and that he had spoken to her at a local festival and later near the courthouse. When he saw her near the courthouse, T.T. asked him if he remembered who she was. E.H. told her that he remembered seeing her at the festival. E.H. denied any sexual contact with T.T., but he could not recall many of the specifics of the events surrounding her allegations. E.H. was investigated for the alleged crime, but when the case was presented to the grand jury, he was not indicted.

The circuit court granted the Commonwealth's motion *in limine.* Therefore, the evidence concerning T.T.'s allegedly false accusations against A.C. and E.H. was excluded from trial. The circuit court opined that the evidence amounted to impeachment on a collateral matter, diverted attention away from the issues at trial, violated the spirit of KRE 412, was overly prejudicial, and was irrelevant.

Capshaw contends that the trial court erred in not allowing this evidence to be admitted during the trial. He maintains that T.T.'s prior accusations of sexual misconduct against A.C. and E.H. were false and should have been admitted into evidence to prove that she had a pattern of making similar false allegations and to prove that she was an untruthful person.

■ We review a trial court's decision concerning the admissibility of evidence for an abuse of discretion. *See Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.*

> [T]he general rule which has emerged in cases involving sexual offenses, is that the admissibility of evidence of similar accusations made by the victim depends on whether they have been proven to be demonstrably false. To comport with the defense theory of a fabrication scheme, there must be proof of the falsity of the unrelated allegations.

*Hall v. Commonwealth,* 956 S.W.2d 224, 227 (Ky.App.1997).

To determine whether unrelated accusations should be permitted into evidence, the *Hall* Court relied on a resolution fashioned by other jurisdictions, holding that

> [i]f the unrelated accusations are true, or reasonably true, then evidence of such is clearly inadmissible primarily because of its irrelevance to the instant proceeding. Additionally, unrelated allegations which have neither been proven nor admitted to be false are properly excluded. If demonstrably false, the evidence still must survive a balancing test, i.e., the probative value must outweigh the prejudicial effect. This approach eliminates the risk of circumventing evidentiary rules designed to protect the legitimate interests of the

victim as well as the risk of obfuscating the real issues; it preserves the integrity of the trial process. Ky. R. Evid. (KRE) 403, 404, 412, and 608.

*Id.* "Thus, the only way such allegations are admissible is if they are demonstrably false, and if the probative value of the evidence outweighs its prejudicial effect." *Berry v. Commonwealth,* 84 S.W.3d 82, 91 (Ky.App.2001). Accordingly, Kentucky's Rape Shield law applies to prior accusations to the extent that the statements are (1) true or (2) have not been proven to be demonstrably false. And, even if proved to be demonstrably false, the allegations must survive a balancing test.

We note that these two exclusions under the Rape Shield law are not entirely consistent with one another. We are not unaware that there is an immense gap between what is true and what can be proved to be demonstrably false. While the *Hall* Court fashioned a test to apply in cases where prior accusations have been made, it failed to set forth what factors or facts would be sufficient to meet the "demonstrably false" test.

 A review of case law from our sister jurisdictions relied upon by the *Hall* Court reveals that "demonstrably false" is self explanatory: "[p]rior accusations are demonstrably false where the victim has admitted the falsity of the charges or they have been disproved." *Fugett v. State,* 812 N.E.2d 846, 849 (Ind.Ct.App.2004) (citing *Perry v. State,* 622 N.E.2d 975, 980 (Ind. Ct.App.1993)). An inference that the accusation is false is insufficient to meet the demonstrably false standard. *Id.* And, a denial of the accusation by the one accused is insufficient to show falsity. *State v. Quinn,* 200 W.Va. 432, 490 S.E.2d 34 (1997) (citing *Commonwealth v. Hicks,* 23 Mass.App.Ct. 487, 503 N.E.2d 969, 973 (1987)) (citations omitted in *Quinn).* Rather, courts have focused on whether

proof has been offered to show that accusations are demonstrably false. *Fugett,* 812 N.E.2d at 849 (citing *Williams v. State,* 779 N.E.2d 610, 613–14 (Ind.Ct.App. 2002)). Accordingly, we surmise from our review of case law from sister jurisdictions that false means that the prior allegations must be *proved to be false* before they are admissible.

Case law from our Commonwealth likewise illustrates that falsehood must be proved before prior allegations are admissible. In *Berry,* a preacher's denial of sexual allegations under oath by avowal was ruled inadmissible. The Court stated that it could "not say that this denial makes the allegation demonstrably false. At best, the allegation has neither been proven nor admitted to be false." 84 S.W.3d at 91.

In the case at hand, three individuals testified during the *in camera* hearing, two of whom T.T. had made accusations against, and both, as would be expected, denied the allegations under oath. Pursuant to *Berry,* this is insufficient to meet the *Hall* test.

The fact that A.C. was never charged with having sexual relations with T.T. does not equate to a finding that her accusations were false. *See State v. Raines,* 118 S.W.3d 205, 214 (Mo.Ct.App.2003) ("[t]hat charges were never filed ... does not mean [they were] false, for there are many reasons ... charges might not be filed, including, e.g., that the prosecutor declined to pursue the charges."). Likewise, the fact that E.H. was not indicted by the Grand Jury is not necessarily consistent with a finding that T.T.'s accusations were false.

Other than A.C. and E.H., the only other person who testified was Detective Decker, and he testified that he had no proof that T.T.'s prior accusations were

true or false. This is insufficient to meet the *Hall* test for admissibility. Accordingly, based on the evidence taken at the *in camera* hearing, we cannot say that the prior allegations by T.T. have been proved false nor admitted to be false. Thus, we believe that under the *Hall* test, absent a showing that T.T.'s prior accusations are in fact false, either by her recanting them or having been proved false, such as by physical evidence, the trial court acted properly in excluding the evidence.

We note that the trial court in this matter did not make an actual finding that the prior allegations were false. We believe that trial courts should make a factual finding regarding the truth or falsity of prior accusations and would require such in future cases. Having found no error by the trial court, we do not believe, however, that we need to remand this case for a finding of truth or falsity of the accusations, particularly in light of the detailed *in camera* hearing held.

Capshaw also argues that he should have been permitted to question T.T. regarding her prior allegations because this line of questioning would not have said anything about any illicit sexual activity in T.T.'s past. Rather, only her pattern of conduct about falsely accusing men of sexual crimes would have been questioned. In essence, he maintains that this line of questioning would not even fall under the Rape Shield law.

Case law does not support Capshaw's contention that prior accusations of sexual crimes do not fall into the exclusions under the Rape Shield law. *See Berry*, 84 S.W.3d at 91. Moreover, Capshaw's argument is inherently flawed because of his continual use of the word "false" allegations. As previously analyzed, T.T.'s allegations were not proved to be false, and she has not recanted them. Accordingly, Capshaw wrongly characterizes her allega-

tions. Because her accusations do not meet the *Hall* test, they were properly excluded.

Turning to Capshaw's claim of violations of the Confrontation Clause under the Sixth Amendment, we likewise find no error. During the *in camera* hearing, Capshaw's counsel argued that the evidence should be admitted to prove a pattern of false accusations and to prove that T.T. was an untruthful person. On appeal, Capshaw maintains that T.T.'s credibility was not subject to cross examination and that this impaired his right to confront his accuser in the absence of the introduction of her prior accusations.

 The Confrontation Clause applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). "At the core of the Confrontation Clause is the right of every defendant to test the credibility of witnesses through cross examination." *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir.2000) (citing *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Mayes v. Sowders*, 621 F.2d 850, 855 (6th Cir.1980)).

> However, it is . . . well established that the right to cross-examination is not absolute and the trial court retains the discretion to set limitations on the scope and subject: "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Davenport v. Commonwealth*, 177 S.W.3d 763, 768 (Ky.2005) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Trial courts " 'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination

based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.*

In the case at hand, Capshaw sought to introduce T.T's prior allegations to impeach her credibility. We agree with the trial court that this was improper. In interpreting the Confrontation Clause, the United States Supreme Court has "never held-or even suggested-that the long-standing rules restricting the use of specific instances and extrinsic evidence to impeach a witness's credibility pose constitutional problems." *Hogan v. Hanks*, 97 F.3d 189, 191 (7th Cir.1996), *cert. denied*, 520 U.S. 1171, 117 S.Ct. 1439, 137 L.Ed.2d 546 (1997); *see also White v. Coplan*, 399 F.3d 18, 25 (1st Cir.2005), *cert. denied*, 546 U.S. 972, 126 S.Ct. 478, 163 L.Ed.2d 384 (2005); *Raines*, 118 S.W.3d 205.

■ Moreover, violations of the Confrontation Clause are subject to a harmless error analysis. *Greene v. Commonwealth*, 197 S.W.3d 76, 83 (Ky.2006) (citing *Coy v. Iowa*, 487 U.S. 1012, 1021–22, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)). "Under the harmless error doctrine, if upon consideration of the whole case it does not appear that there is a substantial possibility that the result would have been any different, the error will be held non-prejudicial." *Gosser v. Commonwealth*, 31 S.W.3d 897, 903 (Ky.2000).

■ In the present case, Capshaw's semen was found in T.T.'s panties, and his only explanation for how it got there was that someone must have broken into his house, stolen a used condom, and placed the semen from that used condom in her panties. The jury did not find this expla-

nation credible or plausible, and neither do we. We do not find that, considering the evidence of Capshaw's semen in T.T.'s panties, there is a "substantial possibility that the result" of Capshaw's trial would have been different if the excluded testimony had been admitted by the trial court. Accordingly, we find no error.

## B. CLAIM REGARDING SEPARATION OF WITNESSES

■ Capshaw alleges that he should be granted a new trial because the rule of separation of witnesses, Kentucky Rule of Evidence (KRE) 615, was violated.[5] We disagree.

We first note that the Commonwealth strenuously maintains that the rule was not invoked, and Capshaw fails to include a citation in his brief to the record showing that the rule was invoked. The trial court upon ruling on Capshaw's request that testimony be excluded as a sanction due to the violation of the rule, noted that Capshaw had not requested an admonition be given to the witnesses about speaking to each other after they testified. Accordingly, the trial court denied Capshaw's request. Assuming *arguendo* that the rule was invoked, upon review, we find no error.

■ The purpose of the separation of witnesses rule has been stated as follows:

The reason for the adoption of the rule is to prevent the witnesses excluded from hearing the testimony of other witnesses with the possible result that the testimony of the others might lead the witness to answer in such manner as to conform with other testimony, even though, as is often the case, the witness

5. We note that, although Capshaw's brief presents his separation of witnesses claim under the heading of prosecutorial misconduct, the claim does not allege that the prosecutor

was involved in the act forming the basis of his separation of witnesses claim. Therefore, this aspect of his prosecutorial misconduct claim fails.

herself is not conscious of this subtle influence.

*Smith v. Miller,* 127 S.W.3d 644, 646 (Ky. 2004) (internal quotation marks and citation omitted). Furthermore, the rule's purpose "is to insure the integrity of the trial by denying a witness the opportunity to alter his testimony." *Id.* (internal quotation marks and citation omitted).

Capshaw alleges that Detective Decker violated the rule by speaking with T.T. and her mother regarding the location of the panties she wore the last time she alleged she had sexual relations with Capshaw, as well as who had given those panties to Detective Decker. This conversation took place during an overnight recess during the trial, out of the presence of the court. At its core the essence of Capshaw's allegation is that there was collusion among the witnesses.

▮ Invoking the rule of separation of witnesses requires that the witnesses be separated so that they cannot hear the testimony in the courtroom. *Woodard v. Commonwealth,* 219 S.W.3d 723, 728 (Ky. 2007). In *Woodard,* the Court observed that

> the spirit of the Rule is not observed when witnesses coordinate their testimony against a party. Unfortunately, there is no practical means to ensure that this does not happen.
>
> Another practical problem is how the trial court addresses accusations of collusion. . . . The trial court has discretion to take corrective measures if a witness enters the courtroom and hears testimony, ranging from holding the witness in contempt to disallowing the witness's testimony. Such violations are fairly obvious. Since the alleged collusion occurred outside the presence of the court, the most it could do is question the witnesses in an effort to ensure a fair trial. The best course is to allow the

testimony subject to proper impeachment on cross examination. That is what the trial court did, and this is not an abuse of discretion.

*Id.,* 219 S.W.3d at 728–29.

Like *Woodard,* in the case at hand, Detective Decker spoke to T.T. outside the presence of the court. He was subject to impeachment on cross examination regarding the inconsistencies in his testimony about the location of the panties. Thus, we find no abuse of discretion by the trial court in refusing Capshaw's request for a sanction by the court to exclude the testimony.

## C. CLAIM OF PROSECUTORIAL MISCONDUCT

▮ We next turn to Capshaw's contention that the prosecutor engaged in misconduct when he allegedly made highly inflammatory and prejudicial statements in his closing argument that were not supported by the evidence. Specifically, Capshaw asserts that, during closing argument, the prosecutor improperly referred to Capshaw as T.T.'s "first lover." Capshaw objected to that statement and moved for a mistrial. The court sustained Capshaw's objection and admonished the jury not to consider the prosecutor's "first lover" statement, but the court denied Capshaw's motion for a mistrial.

> When reviewing allegations of error in closing argument, the required analysis, by an appellate court, must focus on the overall fairness of the trial, and not the culpability of the prosecutor. . . . A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position. . . . Reversal is only justified when the alleged prosecutorial misconduct is so egregious as to render the trial fundamentally unfair.

*Berry,* 84 S.W.3d at 90 (internal quotation marks, brackets, and citations omitted). "Nevertheless, it has long been the law in Kentucky that an admonition to the jury to disregard an improper argument cures the error unless it appears the argument was so prejudicial, under the circumstances of the case, that an admonition could not cure it." *Price v. Commonwealth,* 59 S.W.3d 878, 881 (Ky.2001). Because we do not find the prosecutor's statement to be so egregious as to render the trial fundamentally unfair and because the circuit court admonished the jury not to consider the "first lover" statement, thus, curing the error, Capshaw's prosecutorial misconduct claim fails. *See Berry,* 84 S.W.3d at 90; *Price,* 59 S.W.3d at 881.

## D. CLAIM THAT THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CONVICTION

█ Finally, Capshaw asserts that his convictions should be overturned because the circuit court erred when it denied his motion for a directed verdict and his motion for a new trial based upon the sufficiency of the evidence. Capshaw contends that the evidence was insufficient to support his conviction because T.T.'s statements were contradictory, incredible, and inherently improbable.

The Kentucky Supreme Court has stated as follows:

> So far as the question of the sufficiency of the evidence offered … to sustain the conviction ["for rape"] is concerned, we point to the fact that Kentucky follows the common law rule that the unsupported testimony of the prosecutrix, if not contradictory or incredible, or inherently improbable, may be sufficient to sustain a conviction.

*Stoker v. Commonwealth,* 828 S.W.2d 619, 624 (Ky.1992) (internal quotation marks and citation omitted).

Capshaw asserts that T.T.'s allegations were contradictory, incredible, and inherently improbable. Specifically, he contends that, despite T.T.'s allegations that she engaged in both oral sex and vaginal intercourse with Capshaw five times, but she could not provide dates or times for these occurrences. Capshaw contends that her testimony was insufficient to support the jury verdict.

During her testimony, T.T. testified that she first met Capshaw sometime in October of 2004 and had sexual relations with him later the first night they met. She further testified that she went back to his house every two or three nights and that they engaged in sexual relations on those occasions. She provided November 9th as a date for the last of these five occurrences and accurately described a mole on Capshaw's body below the beltline. She also provided details regarding the layout of the interior of Capshaw's house, including that it looked like a female had decorated it.

Capshaw fails to cite any specific facts that would demonstrate that T.T.'s testimony was contradictory, incredible, or inherently improbable. Thus, her testimony against Capshaw was sufficient to support his convictions. *See id.*

More importantly, T.T.'s allegations were factually supported by Capshaw's semen found in her panties. Therefore, Capshaw's argument that the evidence was insufficient to support his convictions lacks merit.

Accordingly, the judgment of the Monroe Circuit Court is affirmed.

ALL CONCUR.