# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: JUNE 25, 2009
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2007-SC-000253-MR

DATE 7/16/09 Kelly Klaba D.C.

TIMOTHY LEE SIMPSON            APPELLANT

|  |  |
|---|---|
| V. | ON APPEAL FROM BOYD CIRCUIT COURT <br> HONORABLE C. DAVID HAGERMAN, JUDGE <br> NO. 06-CR-00234 |

COMMONWEALTH OF KENTUCKY          APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING IN PART, VACATING AND REMANDING IN PART

Timothy Lee[1] Simpson challenges his convictions for murder and tampering with physical evidence, maintaining there was insufficient evidence that he murdered Faith Clay and that the Commonwealth made improper comments during its closing argument. We agree that the Commonwealth made improper remarks during its opening and closing statements about two cell mates of Appellant's who were not called as witnesses at trial. However, we adjudge that said error does not rise to the level of palpable error in this case. Although not raised by Appellant, we acknowledge the trial court's clear error in running the five-year sentence consecutive to the life sentence. Thus, we

---

[1] The notice of appeal lists Appellant's name as "Timothy Lee Simpson", but the lower court records refer to the defendant as "Timothy Scott Simpson." The Commonwealth's documents refer to Appellant as "Timothy Scott Simpson."

vacate the sentence and remand for resentencing in accordance with this opinion. We reject the remaining claims of error and affirm in all other respects.

In 2006, Appellant, Timothy Lee Simpson, was living in a garage apartment behind his mother's house. At 5:04 a.m. on February 16, 2006, Appellant's mother, Linda Simpson, placed a 911 call reporting that Appellant's "girlfriend had a gun and she shot herself." Numerous officers from the Ashland Police Department ("APD") responded to the scene.

When the police arrived, they observed the dead body of the victim, Faith Clay, lying on her back on a couch in the living room. Her face was covered in blood, and it appeared that she had been shot just below her right eye. Appellant's 9 mm handgun was on a chair six to eight feet away from Clay's body.

Appellant was calm at the scene and consented to be interviewed by police. Appellant told police that he had been at his computer listening to music when he heard a shot. Appellant then ran into the living room and saw Clay bleeding from her right eye. The Appellant stated that he grabbed some cloth items and held them on Clay's head in an attempt to stop the blood flow. At some point, Appellant went to his mother's house.

After a period of knocking on his mother's door, Linda Simpson finally answered, and they both went back to Appellant's apartment. Linda Simpson testified that once in the apartment, Appellant reached down and picked up the

gun. She then took the gun from Appellant with a piece of paper and laid it in the chair.

The police took photographs and gathered evidence from the scene in order to make the determination whether the shooting was a suicide or a homicide. The next day, the police received an anonymous tip that resulted in a second search warrant being issued regarding Appellant's apartment. Pursuant to that search, police found two 2-liter plastic Mountain Dew bottles and a 20-ounce plastic Mountain Dew bottle in the trash can in the alley behind Appellant's apartment. The 20-ounce bottle had a hole in the bottom. Police also found numerous pieces of used duct tape in the garbage and at various places in the apartment. One piece of duct tape found underneath a couch cushion had a plastic ring from a soft drink bottle stuck to it. Several small pieces of green plastic and another plastic ring were found around the couch where Clay's body had been. Blood which was ultimately found to match Clay's DNA was found on two pieces of the used duct tape.

In conducting the autopsy on Clay's body, the Medical Examiner found several bits of green plastic shrapnel in Clay's hair, on her head, and underneath her right eye. A portion of another white plastic bottle ring was also found on her body. The Medical Examiner determined that the bullet entered Clay's lower right eyelid and exited the left side of the back of her skull. Because of the shrapnel around the entry wound, the irregular shape of the entry wound, and the absence of stippling or smoke residue around the wound,

the Medical Examiner opined that Clay had been shot through some sort of barrier. Although high levels of Methadone and Xanax were found in Clay's bloodstream, the Medical Examiner concluded the cause of death to be from the gunshot wound to the head. As to manner of death (suicide or homicide), the Medical Examiner reported it undetermined due to the suspicious plastic fragments recovered from the body, the location of the wound, and the fact that it was an "atypical" wound.

A forensic analyst determined that the pieces of green plastic found in the apartment matched the pieces found on Clay's body, and that all the pieces had once been part of the same object. The pieces were further determined to be identical to the plastic of a 2-liter Mountain Dew bottle.

In the search of Appellant's apartment, police found a receipt showing that Appellant had purchased the 9 mm handgun that Clay was shot with on February 10, 2006, less than a week before her death. Police also discovered a bullet hole in the ceiling, which Appellant initially stated was from when he got mad a few days earlier and shot a hole in the ceiling. Underneath the deck of Appellant's apartment, police found the burnt remains of various items of synthetic fabric and a 9 mm shell casing.

Appellant gave two statements to police, one on the day Clay was shot and one the next day, after police had conducted the second search of Appellant's apartment. After being confronted with the information about the plastic pieces and bottles recovered by police, Appellant admitted in the second

interview that his gun had had a 2-liter Mountain Dew bottle duct-taped to the end of it to make a homemade silencer. He stated that he had an interest in silencers and had test-fired the gun with the homemade silencers, determining that the 2-liter silencer worked better. He told police that he sometimes test-fired the gun by the railroad track, but had test-fired the gun in the apartment a few days before, which caused the bullet hole in the ceiling. He maintained, however, that Clay had shot herself with the silencer on the end of the gun. He further admitted removing and disposing of the plastic bottle from the gun, other plastic bottles, and some shell casings before police were called because he thought it would make him look guilty. Appellant claimed he kept the gun with the homemade silencer on the end of it under the couch and that Clay must have found it there and shot herself.

On September 21, 2006, Appellant was indicted for the murder of Faith Clay and tampering with physical evidence. The case was tried by a jury from February 6–14, 2006.

The defense theory of the case at trial was that Clay was a homeless drug addict who was depressed and suicidal over having her three children taken away. Linda Simpson and Judy Anderson, a friend of Appellant's, testified that Clay had told them she wanted to kill herself. Bessie Daniels, whose cousin had dated Clay, testified to an incident in 1999 or 2000 wherein Clay tried to shoot herself in the head over losing her children.

The Commonwealth presented evidence that, although Clay suffered from

depression and was a drug user, she was not suicidal and had a plan to get her life back on track and get her children back. The Commonwealth's theory of the case was that Appellant shot Clay while she was asleep on the couch. William Easton, a cell mate of Appellant's and a witness for the Commonwealth, read a letter at trial that he had previously sent to the prosecutor stating that Appellant told him on several occasions that he shot and killed Clay.

The jury found Appellant guilty of murder and tampering with physical evidence and recommended a sentence of life imprisonment for murder and five (5) years for tampering with physical evidence, to be served consecutively. The court sentenced Appellant according to the jury's recommendations. This appeal followed.

## **DIRECTED VERDICT**

Appellant argues that there was insufficient evidence tying him to the shooting of Clay, thus, the trial court erred in failing to grant his motion for a directed verdict. He maintains that the Commonwealth's case was based on thin circumstantial evidence, with the exception of the testimony of inmate William Easton, a highly suspect witness.

A trial court's decision regarding a directed verdict motion is reviewed under the standard articulated in Commonwealth v. Benham, 816 S.W.2d 186, 187 (Ky. 1991):

> On motion for directed verdict, the trial court must
> draw all fair and reasonable inferences from the

evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony. On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

The Commonwealth may prove guilt by circumstantial evidence. Varble v. Commonwealth, 125 S.W.3d 246, 254-55 (Ky. 2004); Blades v. Commonwealth, 957 S.W.2d 246, 250 (Ky. 1997). Circumstantial evidence is evidence that makes the existence of a relevant fact "more likely than not." Timmons v. Commonwealth, 555 S.W.2d 234, 237-38 (Ky. 1977).

> Although circumstantial evidence "must do more than point the finger of suspicion," Davis v. Commonwealth, 795 S.W.2d 942, 945 (Ky. 1990), the Commonwealth need not "rule out every hypothesis except guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 326, 99 S.Ct. 2781, 2792-93, 61 L.Ed.2d 560 (1979).

Ratliff v. Commonwealth, 194 S.W.3d 258, 267 (Ky. 2006). A "[c]onviction can be premised on circumstantial evidence of such nature that, based on the whole case, it would not be clearly unreasonable for a jury to find guilt beyond a reasonable doubt." Graves v. Commonwealth, 17 S.W.3d 858, 862 (Ky. 2000).

In the instant case, there was an abundance of circumstantial evidence

that Appellant shot and killed Clay. The evidence was undisputed that only Clay and Appellant were in the apartment when Clay was shot. The evidence that Appellant's homemade plastic-bottle silencer was on the end of the gun that shot Clay and that Appellant attempted to hide that evidence from police was likewise undisputed.

The Medical Examiner, Dr. Kristen Rolf, testified that the amount of Methadone in Clay's system the night she was shot, .75 mg per liter, was high enough to kill a person who did not have a tolerance for the drug. Dr. Rolf testified that Methadone tends to make people very sleepy and that combining the drug with Xanax, a sedative, would enhance its sedating effects. Although Dr. Rolf could not say what Clay's tolerance level was, she testified that given the high level of Methadone in her system, combined with Xanax, Clay would definitely have been physically and mentally impaired as a result of the drugs. This evidence would support the Commonwealth's assertion that Clay was passed out at the time of the shooting and would have had great difficulty shooting herself in the eye with the gun with a 2-liter bottle taped to the end of it. Dr. Rolf also testified that it is extremely rare for a person to commit suicide by shooting oneself in the eye.

There were inconsistencies between Appellant's two statements to police as to when Appellant sought help from his mother and how much time elapsed between the shooting and when 911 was called. It was undisputed, however, that a significant period of time elapsed before the police were called. Further,

while Appellant claimed he picked up the gun after the shooting and gave it to his mother, there were no fingerprints on the gun. Nor was there any residue from the duct tape that Appellant admitted had been on the end of the gun. This would suggest that the gun had been cleaned off before the police arrived. There was also the evidence of Clay's blood found on Appellant's clothing.

The Commonwealth presented the testimony of three mental health professionals who had recently evaluated Clay. All three testified that Clay was not suicidal. Additionally, Clay's caseworker testified that she had never heard Clay say anything about wanting to kill herself.

Finally, there was the testimony of William Easton during which he read the letter he sent to the prosecutor about Appellant's jailhouse confession to him. Easton's letter stated that Appellant told him several times that he shot Clay with a gun fitted with a homemade pop-bottle silencer. According to Easton, Appellant stated that he aimed for Clay's right eye because she had an infection in that eye at the time, so he "cleared it up for her." The Commonwealth presented medical evidence that Clay did, in fact, have an infection in her right eye at the time of her death.

In sum, there was more than sufficient evidence to support the jury's finding that Appellant was the one who shot Clay. Under the evidence as a whole, it was not clearly unreasonable for the jury to find Appellant guilty of murder.

## COMMONWEALTH'S IMPROPER STATEMENTS DURING CLOSING ARGUMENT

During the Commonwealth's opening statement and closing argument, the prosecutor referred to the letter written by inmate William Easton alleging that Appellant had confessed in jail to shooting Clay. In his opening statement, the prosecutor stated that he intended to call Easton as a witness, as well as two other inmates who would testify to Appellant's jailhouse confessions. During Appellant's opening statement, defense counsel preemptively attacked the credibility of the three intended jailhouse witnesses, referring to their criminal records and the "sweetheart deal" they received from the Commonwealth. While the Commonwealth did ultimately call Easton as a witness at trial, it never presented the testimony of the other two inmates.

In Appellant's closing argument, defense counsel again commented on the credibility of Easton, emphasizing the robbery, theft and drug charges against him, the fact that he was arrested by Appellant's cousin, and the "sweetheart deal" of five years he got for testifying against Appellant. In response to these remarks, the prosecutor in his closing argument stated the following:

> Now folks we did not illicit (sic) the testimony of
> William Eastham (sic). We didn't illicit (sic) at all and
> we wouldn't have elicited it in the first place because
> he's probably not a trustworthy person.[2] People in
> jail, wonder why they're in jail. They'll say pretty
> much what they need to say if they can get some

---

[2] Easton was called as a witness by the Commonwealth to authenticate and read the letter he wrote to the prosecutor. While the Commonwealth did not elicit testimony from him about the substance of Appellant's confession, there was testimony elicited on whether he received a plea deal in exchange for his testimony and on his criminal record.

10

mercy in a case. But let me tell you something, there's no explanation for that letter or that information and let me tell you why. First of all, Mr. Eastham (sic) got a deal from the previous administration, Mr. Schneider's administration, five years active in jail, in prison. That's not unusual. Trust me, that was not a sweetheart deal. But I want to read you, I would like for you to take this letter back with you to the evidence room. The important part of this is, ["]I speak freely with Mr. Simpson daily["][3], this is dated November 11, 2006, ["]I speak freely with Mr. Simpson daily and in most of our conversations we speak about our cases.["] That's probably true, most people do I guess. ["]And as Mr. Simpson speaks on the charges he stated to me on several occasions that he did in fact shoot Ms. Fields[4] and kill her and also he states that he had a homemade silencer made for his .9 mm pistol made out of a two liter pop bottle because a 20 ounce pop bottle 'wouldn't work, it would just blow out at the end of the gun.'["] Now if that's all he said I wasn't going to put him on here. We had other people remember I told you there were other confessions, we didn't bring them and I wouldn't have brought him for this except for the next sentence. He said she, Ms. Fields, had an eye infection and that she couldn't clear it up so he cleared it up for her. That's why the shot aimed for Ms. Fields' eye. And you see, Mr. Curtis told you that there was discovery. Mr. Curtis is not telling you the entire truth. There was no discovery.

At that point, defense counsel objected on grounds that the prosecutor misstated that there was no information produced in discovery (which Mr. Easton could have found looking through Appellant's papers in jail) about Ms. Clay's eye infection. There was no objection to any of the other statements of the prosecutor above.

---

[3] Although the transcript of the Commonwealth's closing does not contain quotation marks, it is apparent that the prosecution was quoting from Easton's letter.

[4] Apparently, the victim's maiden name was Fields and the Commonwealth referred to her as "Fields" during the trial.

Appellant maintains that the above statement was improper because of the prosecutor's comment that Easton did not get a "sweetheart deal." Appellant argues that this was a misstatement because Easton received a significant reduction in his sentence (from 30 years to five years and having his PFO charge dropped) and that the "trust me" portion of the statement was improper because it amounted to bolstered testimony by the prosecutor that the deal was not a "sweetheart deal."

First, the argument about this statement was not preserved because Appellant did not object to that statement. Secondly, the comment by the prosecution was not improper where there was evidence that Easton was not required by his plea agreement to write the letter to the Commonwealth or to testify at Appellant's trial. Easton testified that no one offered him any deals to write the letter or to testify at Appellant's trial, which was corroborated by a statement made to the court by Easton's attorney at a hearing during the trial. The relevancy of Easton's plea deal as it related to his credibility at Appellant's trial was limited to whether it was the result of an agreement to testify at Appellant's trial. "This Court has repeatedly held that a prosecutor is permitted wide latitude during closing arguments and is entitled to draw reasonable inferences from the evidence, as well as respond to matters raised by the defense." Commonwealth v. Mitchell, 165 S.W.3d 129, 132 (Ky. 2005) (citations omitted). Given the suggestion of the defense that Easton received a "sweetheart deal" for testifying against Appellant and the evidence that Easton

12

received no such deal, it was not improper for the prosecutor to respond to and deny this allegation in his closing argument.

Appellant also argues that the Commonwealth made improper statements during its closing about whether Easton could have learned about the victim's eye infection through discovery materials received by Appellant in jail. When Appellant objected to the initial statement that there had been no discovery about Clay's eye infection prior to Easton writing the letter, the court sustained the objection because there was no evidence in the record on whether there had been any discovery on the eye infection at the time Easton's letter was written. No request for an admonition was made by the defense and none was given. The prosecutor then resumed his closing argument, stating that there was no way Easton could have known about Clay's eye infection unless Appellant had told him.

Despite the fact that Appellant received a ruling in his favor, he nevertheless argues before us that the comments about defense counsel not telling the truth about whether there had been discovery regarding Clay's eye infection prior to Easton writing the letter constituted prosecutorial misconduct. We reverse for prosecutorial misconduct in a closing argument only if the misconduct is "flagrant" or if each of the following three conditions is satisfied:

> (1) Proof of defendant's guilt is not overwhelming;
>
> (2) Defense counsel objected; and

(3) The trial court failed to cure the error with a sufficient admonishment to the jury.

United States v. Carroll, 26 F.3d 1380, 1390 (6th Cir. 1994); United States v. Bess, 593 F.2d 749, 757 (6th Cir. 1979); Barnes v. Commonwealth, 91 S.W.3d 564, 568 (Ky. 2002). Four factors to be considered in determining whether the prosecutor's misconduct is "flagrant" are:

(1) whether the remarks tended to mislead the jury or to prejudice the accused;

(2) whether they were isolated or extensive;

(3) whether they were deliberately or accidentally placed before the jury; and

(4) the strength of the evidence against the accused.

Carroll, 26 F.3d at 1385.

As noted above, defense counsel did object to this statement at closing and no admonishment was given. Regarding whether proof of Appellant's guilt was overwhelming, given our earlier analysis of the evidence presented against Appellant, we deem that the proof was overwhelming. Accordingly, we must proceed to the analysis of whether the prosecutorial misconduct was "flagrant."

In adjudging whether the prosecutor's remarks were intended to mislead the jury, we note that while there was no evidence in the record as to when the parties learned through discovery about Clay's eye infection, there likewise was no evidence that said discovery definitely did occur and Appellant had these discovery documents in his cell prior to Easton writing his letter. Thus,

14

although the prosecutor should not have accused defense counsel of lying in his closing, the remarks did not appear to be intended to mislead the jury. The prosecutor was merely trying to make his point that Easton could not have known about the victim's eye infection unless Appellant had told him. Contrary to Appellant's assertion, although Easton admitted that it was not uncommon for inmates to look through other inmates' files and documents, Easton never testified that he had access to or looked through Appellant's papers. Easton maintained that he learned about the victim's eye infection from Appellant himself.

While the prosecutor's remark that defense counsel was not telling the truth appeared to be deliberate and was uncalled for, the prosecutor's comments about discovery of the victim's eye infection in his closing were isolated and not extensive. Regarding the strength of the evidence against Appellant, as discussed above, proof of Appellant's guilt was overwhelming. Accordingly, the prosecutor's remarks at issue here did not rise to the level of flagrant prosecutorial misconduct.

The final allegation of prosecutorial misconduct is with regard to the prosecutor's reference in his closing to the two other inmates that Appellant allegedly confessed to, whose testimony was never presented at trial – "We had other people remember I told you there were other confessions, we didn't bring them and I wouldn't have brought him for this except for the next sentence." "In closing argument, '[i]t is the duty of the prosecuting attorney to confine

15

himself to the facts in evidence and fair inferences that may be drawn therefrom.'" Brown v. Commonwealth, 174 S.W.3d 421, 431 (Ky. 2005) (quoting Williams v. Commonwealth, 644 S.W.2d 335, 338 (Ky. 1982)).

Compounding the impropriety, the prosecutor informed the jury in his opening statement that there were two other inmates besides Easton that Appellant had confessed to and that he intended to call them as witnesses. In making its opening statement, the Commonwealth may state all of the facts and circumstances which it expects in good faith to be established by the evidence. Freeman v. Commonwealth, 425 S.W.2d 575, 578 (Ky. 1967). It is improper for the Commonwealth to state facts in an opening statement which it does not reasonably expect to prove from the evidence at trial. Turner v. Commonwealth, 240 S.W.2d 80, 81 (Ky. 1951). However, the Commonwealth's failure to establish facts alleged in its opening statement may be regarded as harmless error when the evidence against the defendant is overwhelming. Kroth v. Commonwealth, 737 S.W.2d 680, 681 (Ky. 1987).

Appellant failed to object to the reference to the two inmates in the Commonwealth's closing argument and did not ask for any relief based on the Commonwealth's failure to call the two witnesses mentioned in its opening statement. Thus, the issue is wholly unpreserved. Nevertheless, Appellant asks us to review the argument under RCr 10.26 for manifest injustice.

As to whether the prosecutorial misconduct rose to the level of "flagrant" here, we note that, in the absence of any explanation in the record

16

for why the Commonwealth failed to call these two intended jailhouse witnesses, we must conclude that the prosecutor's remarks were deliberate and not accidental. While the purpose of the reference to the two inmates in the Commonwealth's closing was not to mislead the jury or bring in additional evidence, it was clearly intended to improperly bolster the credibility of Easton. The prosecutor was trying to show that because Easton knew about the victim's eye infection, his statement about Appellant's confession was more credible. Thus, we must balance these factors against the fact that the comment during closing was isolated and the evidence against Appellant was overwhelming.

It is worth noting that defense counsel also stated in his opening statement that he would call another fellow inmate of Appellant's who would testify that Appellant did not confess to the crime. However, that witness was never called by the defense. Further, the defense extensively impeached the credibility of Easton during cross-examination and individually attacked the credibility of all three intended witnesses in its opening statement. And while Easton's testimony was certainly helpful to the Commonwealth's case, even if Easton's letter had not been admitted, as discussed earlier, there was an abundance of circumstantial evidence that Appellant was the one who shot and killed Clay.

In a similar case before this Court, <u>Ruppee v. Commonwealth</u>, 821 S.W.2d 484, 486 (Ky. 1991), <u>overruled on other grounds by Lovett v.</u>

Commonwealth, 103 S.W.2d 72 (Ky. 2003), wherein the prosecutor referred in his opening statement and closing argument to facts not in evidence and to an intended witness who was not ultimately called to testify, we held that the remarks did not amount to reversible error. And because the remarks were based on fair inferences from the evidence, we adjudged that the "prosecutor did not exceed the bounds of reasonable latitude." Id. at 486-87.

In sum, although we condemn the prosecutor's misconduct here, we cannot say that it rose to the level of "flagrant" misconduct given the overwhelming evidence against Appellant in this case. Moreover, under a palpable error analysis, we cannot say there was a "probability of a different result or error so fundamental as to threaten [Appellant's] entitlement to due process of law." See Depp v. Commonwealth, 278 S.W.3d 615, 620 (Ky. 2009) (quoting Martin v. Commonwealth, 207 S.W.3d 1, 3 (Ky. 2006)).

## SENTENCING ERROR

Although not raised by Appellant, that portion of the judgment ordering his five-year sentence for tampering with physical evidence to run consecutive to his life sentence for murder was palpable error. Pursuant to KRS 532.110(1)(c), a sentence for a term of years cannot run consecutive to a life sentence. Yarnell v. Commonwealth, 833 S.W.2d 834 (Ky. 1992); See v. Commonwealth, 746 S.W.2d 401 (Ky. 1988). Accordingly, we *sua sponte* vacate the sentence, and remand to the trial court for resentencing to order that the five-year sentence be run concurrent with the life sentence.

18

For the reasons stated above, the judgment of the Boyd Circuit Court is affirmed in part and vacated in part and remanded for resentencing in accordance with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

David Nicholas Zorin
Suite 1640 World Trade Center
333 West Vine St.
Lexington, KY 40507


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

James Chesnut Maxson
Office of the Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, KY  40601